**KENTUCKY STATE RACING COMMISSION et al., etc., Appellants,**

v.

**Peter FULLER, Appellee.**

Court of Appeals of Kentucky.

April 28, 1972.

Rehearing Denied June 30, 1972.

John B. Breckinridge, Atty. Gen., George F. Rabe, Asst. Atty. Gen., Squire N. Williams, Jr., Frankfort, Rufus Lisle, Harbison, Kessinger, Lisle & Bush, Lexington, for appellants.

Arthur W. Grafton, Wyatt, Grafton & Sloss, Stuart E. Lampe, Edward S. Bonnie, Brown, Eldred & Bonnie, Louisville, for appellee.

CATINNA, Commissioner.

This appeal from the Franklin Circuit Court was filed in this court on March 8, 1971. Filed with the record were five volumes, 1162 pages, of the proceedings before the Stewards and fourteen volumes, 2860 pages, of the proceedings before the Kentucky State Racing Commission. Appellants' brief was filed on July 30, 1971; appellee filed his brief on September 20, 1971. Appellants filed a reply brief on December 9, 1971, and appellee filed a responsive brief on January 13, 1972.

On Saturday, May 4, 1968, the thoroughbred, Dancer's Image, owned by Peter Fuller, crossed the finish line first in the Seventh Race at Churchill Downs, the Kentucky Derby, followed by Forward Pass, Francie's Hat, T.V. Commercial, and Kentucky Sherry, in that order.

Thoroughbred racing in Kentucky is under the supervision of the Kentucky State Racing Commission and conducted under rules adopted by the Commission. Accordingly, a urine specimen was taken from Dancer's Image under the supervision of the state veterinarian, L. M. Roach, and delivered to the mobile laboratory of Louisville Testing Laboratory, Inc., at Churchill Downs.

The Louisville Testing Laboratory, Inc., owned by Kenneth W. Smith, was the official chemist for the Commission and, by contract, did chemical tests of samples from thoroughbred races. The purpose of these tests was to determine if there was present in the sample forbidden medication including phenylbutazone or one of its derivatives.

On May 6, 1968, the official chemist of the Kentucky State Racing Commission re-

ported to the Stewards that the urine tests of Dancer's Image indicated the presence of a medication known as phenylbutazone or one of its derivatives.

The rules of racing of the Kentucky State Racing Commission required that responsible parties be notified and a hearing conducted with appropriate penalties for violators of the rules, including a redistribution of the purse. The Stewards held a hearing on May 13, 14, and 15, 1968, at which time all affected parties were present in person or by counsel. At the conclusion of the hearing, May 15, 1968, the Stewards found that phenylbutazone or one of its derivatives was present in the urine of Dancer's Image on May 4, 1968, in violation of the rules of racing and directed that the purse be distributed as follows:

| | |
|---|---|
| 1st money | Forward Pass |
| 2nd money | Francie's Hat |
| 3rd money | T. V. Commercial |
| 4th money | Kentucky Sherry |

The betting on the race and the payment of parimutuel tickets were not affected.

Peter Fuller, owner of Dancer's Image, appealed this ruling to the Kentucky State Racing Commission. The Commission conducted an extensive hearing over a period of fourteen days, commencing November 18, 1968, and concluding December 7, 1968. The Commission issued its findings of fact, conclusions of law, and order on January 6, 1969, which sustained the Stewards' order of May 15, 1968.

The order of the Kentucky State Racing Commission was appealed to the Franklin Circuit Court. While this appeal was pending, counsel for Peter Fuller introduced additional evidence in support of an alleged denial of due process of law by the Commission. On December 11, 1970, the Franklin Circuit Court issued a "Memo Opinion" which made certain findings of fact and rulings of law. On December 31, 1970, the judgment was entered. This judgment adopted the "Memo Opinion" of December 11, 1970, and directed that the order of the

Kentucky State Racing Commission of January 6, 1969, be set aside for lack of substantial evidence to support it and that distribution of the purse in the Seventh Race at Churchill Downs on May 4, 1968, be made in accordance with the order of finish.

The Kentucky State Racing Commission appeals. The sole issue raised by the appellants is whether the January 6, 1969, order of the Commission was supported by substantial evidence.

The appellee filed a motion to dismiss the appeal, which was passed by this court to the merits of the case.

The motion to dismiss the appeal is overruled, and the judgment of the Franklin Circuit Court is reversed.

The Kentucky State Racing Commission is an independent agency of state government. KRS 230.220. The Commission, charged with the duty of maintaining integrity and honesty in racing, was directed to promulgate rules and regulations "for effectively preventing the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed or health of horses in races in which they are to participate." KRS 230.240. The Commission was vested with all powers necessary and proper to carry out fully and effectively those duties imposed upon it by the statutes. KRS 230.260.

All persons aggrieved by an order of the Commission are granted an appeal to the Franklin Circuit Court in the manner provided by KRS 243.560 to 243.590, being the same sections of the statute governing appeals from orders of the Alcoholic Beverage Control Board. KRS 230.330. Upon the appeal no additional evidence shall be introduced except as to the fraud or misconduct of some party engaged in the administration of the act and affecting the order appealed from. The court shall otherwise hear the case upon the record as attested by the Commission. Upon the appeal the review of the court is limited to

determining whether or not (a) the Commission acted without or in excess of its powers; (b) the order appealed from was procured by fraud; (c) if questions of fact are in issue, whether or not any substantial evidence supports the order appealed from. KRS 243.570.

Any party "aggrieved" by a judgment of the Franklin Circuit Court is granted an appeal to the Court of Appeals in accordance with the Rules of Civil Procedure. KRS 243.590.

Rules adopted by the Kentucky State Racing Commission regulating the subject matter of this appeal are as follows:

"14.04 Should the chemical analysis of saliva, urine or other sample taken from a horse indicate the presence of a forbidden narcotic, stimulant, depressant, local anaesthetic, or a medication which is a derivatice of phenylbutazone, it shall be considered prima-facie evidence that such has been administered to the horse. * * *.

"14.05 When such positive report is received from the State Chemist by the Stewards the persons held responsible shall be notified, and a thorough investigation shall be conducted by or on behalf of the Stewards. * * *.

"14.06 The trainer shall be responsible for the condition of the horses he enters. Should the chemical analysis of any sample indicate the presence of any forbidden narcotic, stimulant, depressant, local anaesthetic, or a medication which is a derivative of phenylbutazone, the trainer of the horse, together with the assistant trainer, stable foreman, groom, or any other person shown to have had care and attendance of the horse shall be subject to the penalties prescribed in section XXIII, and such horse shall not participate in the purse distribution."

Appellee's motion to dismiss the appeal is grounded upon the contention that the appellants are not "aggrieved parties" within the purview of the statute and thus have no legal right to maintain this appeal. Appellee contends that as the Commission is an administrative agency it can have no partisan interest in its decisions and therefore is not aggrieved by an adverse court decision; and that the Commission, in exercising its quasi-judicial function, could not have a legal interest in maintaining its determination. Thus, an adverse decision by the court deprives it of no right or privilege.

The Kentucky State Racing Commission is more than an administrative agency having the quasi-judicial function of finding the facts and applying the law to the facts. The Commission was created for the purpose of maintaining integrity and honesty in racing; the promulgation and enforcement of rules and regulations effectively preventing the use of improper devices, the administration of drugs or stimulants, or other improper acts for the purpose of affecting the speed or health of horses; and the promotion of interest in the breeding of and improvement of the breed of thoroughbred horses. The Commission is vested with extensive authority over all persons on racing premises for the purpose of maintaining honesty and integrity and orderly conduct of thoroughbred racing. On the basis of the statutes heretofore referred to, the Commission is charged with the duty of protecting substantial public interest and is therefore a representative of this interest in all proceedings.

The expression "person aggrieved" or "party aggrieved" has no technical meaning. What it means depends on the circumstances involved. It has been defined as meaning adversely affected in respect of legal rights, or suffering from an infringement or denial of legal rights. "One may be aggrieved within the meaning of the various statutes authorizing appeals when he is affected only in a representative capacity." In re Halifax Paper Company, Inc., 259 N.C. 589, 131 S.E.2d 441 (1963).

In Minnesota Water Resources Board v. County of Traverse et al., 287 Minn. 130,

177 N.W.2d 44 (1970), the Water Resources Board appealed from an adverse judgment of the district court. Appellee filed a motion to dismiss the appeal, claiming that the Water Resources Board was not an aggrieved party under either the Watershed Act or the Administrative Procedures Act. The Watershed Act provided in part: "Any party aggrieved by a final order or judgment * * * may appeal therefrom to the supreme court * * *." Minn.St. § 112.82, subd. 1. The Administrative Procedures Act provided in part: "An aggrieved party may secure a review of any final order or judgment * * * by appeal to the supreme court." Minn.St. § 15.0426.

On the question of the Water Resources Board's being an aggrieved party, the court said:

"* * * Whether it is an aggrieved party under either the Administrative Procedures Act or the Watershed Act depends, as we see it, on whether it is essentially an administrative agency of the state empowered to initiate proceedings within the sphere of its jurisdiction and to establish and implement policy on behalf of the state, or whether its functions are limited to resolving disputes between conflicting interests of other agencies, subdivisions of government, and individuals."

Following a discussion of the rule in other jurisdictions, the court said:

"A review of these and other authorities leads us to the conclusion that the right of appeal depends largely on whether express provision is made in the particular statute involved. As we have previously indicated, where the language is broad as in § 112.82, subd. 1, relating to any 'party aggrieved,' the test seems to be whether the agency is created to represent the interests of the public or whether it is to act only in deciding controversies between other entities of government or individual members of the public."

In Workmen's Compensation Board of Kentucky v. Abbott, 212 Ky. 123, 278 S.W. 533 (1925), this court, in holding that the Workmen's Compensation Board had the right to appeal from an adverse ruling of the circuit court, said:

"Before taking up the questions argued on the merits of the case, we will first briefly consider a question of practice raised by an amicus curiae brief filed in the case by permission of this court. It is that the Board has no right or authority to prosecute an appeal in this class of cases from the circuit court to this one. Involved in that question is the further one as to the extent of the Board's interest in the matters involved, i. e., whether under the act it is only a mere nominal party to the proceedings on appeal either to the circuit or to this court; or whether it has, as the representative of the public, a substantial interest beyond that of a mere nominal party and which question will be hereinafter answered to the effect that it is more than a mere nominal party. Notwithstanding that fact, however, it, perhaps, would have been competent for the Legislature to deny it the right of appeal to this court and to have conferred it alone on the employer and the employee; but the fact that the Board is more than a nominal party and represents some substantial interests of the public in the due and proper administration of the act (as hereinafter shown) is persuasive that the Legislature did not intend to withhold from it the right of appeal so that it might protect that interest in this court to which an appeal may be taken; and, therefore, such right should not be denied, unless the act does so in clear and explicit terms. The provisions for an appeal to the circuit court are contained in section 52 of the act, now section 4935 of our Statutes, and, of course, the Board could scarcely be an appellant to the circuit court, since the appeal is from its award, which, however, is untrue with reference to the judgment of the circuit court on review of the award. Therefore, we do not attribute any particular significance to the word 'party' in that section with reference to

who may appeal from the award of the Board to the circuit court. Section 53 of the act, now section 4936 of our Statutes, makes provisions for an appeal to this court from the judgment of the circuit court, and it is therein provided that the scope of this court's review 'shall include all matters herein made the subject of review by the circuit court and also errors of law arising in the circuit court,' etc. It is then further provided that—

'The procedure as to appeal to the Court of Appeals shall be the same as in civil actions, so far as the same may be applicable to and not in conflict with the provisions of this act, except as follows.'

"There is then prescribed what evidence shall be brought to this court and the method by which it may be done, as well as the duty of 'the appellant' in the premises, after which certain provisions are made as to the duties of the circuit clerk upon direction of 'the parties' with reference to the transmission of the record to this court, as well as what it should contain. The section, supra, providing for an appeal to the circuit court, says, inter alia, 'The Board and each party shall have the right to appear in such review proceedings,' and the right to appear carries with it the further one to be heard, which latter right is not usually accorded to a mere nominal party. We therefore hold that it was the purpose of the act to give the Board, which must be summoned on appeal to the circuit court, the right to be heard in that court, and the section providing for an appeal to this court, as we have seen, vests it with the right to review the same matters that were reviewed by the circuit court, and it would seem naturally to follow that if the Board had the right to be heard in the review by the circuit court, it would likewise have the same right in this court. We therefore hold that it is competent for the Board to appeal to this court from any judgment rendered by the circuit court in all cases where the amount involved is appealable to this court."

See also Boyd & Usher Transport v. Southern Tank Lines, Inc., Ky., 320 S.W.2d 120 (1959).

■ We conclude that the Kentucky State Racing Commission is a "party aggrieved" within the purview of KRS 243.590 and can, therefore, maintain this appeal. The motion to dismiss this appeal is overruled.

The real issue before this court is whether there was substantial evidence on the record as a whole to support the findings of the Kentucky State Racing Commission.

The rules of the Commission prohibiting the use of phenylbutazone require that the presence of this medication be determined by chemical analysis. Rules 14.04–14.06. The Commission is authorized by statute to contract with a laboratory for the making of chemical tests of saliva and urine. KRS 230.240. On May 4, 1968, Louisville Testing Laboratory, Inc., was, by contract, making the tests required by the Commission. Kenneth W. Smith was the president and chief chemist of the laboratory. Smith is a graduate of the University of Louisville with Bachelor's and Master's degrees in chemistry. He had performed chemical tests for the Commission for more than twenty-eight years during which time he had tested approximately 50,000 urine samples. Smith had two assistants, Maurice K. Cusick and James W. Chinn. Cusick had a degree in chemistry and eighteen years of experience in racetrack chemistry. He was laboratory supervisor. Chinn was a laboratory technician and had been with Smith since 1960.

Five chemical tests of the urine sample are required in order to indicate the presence of phenylbutazone. Smith performed each of these tests on a urine sample designated as 3956U, or for laboratory purposes 9, and was unaware of the fact that the sample was from Dancer's Image until long after the results of the tests had been

reported to the Stewards. The tests used had been recommended by the Association of Official Racing Chemists as those necessary for reporting the presence of phenylbutazone. The tests performed by Smith were as follows:

(1) Vitali's color test;

(2) Spectrophotometric curve in base solution of pH 11 to 13, and spectrophotometric curve at pH2;

(3) Typical crystal test with copper chloride ethlenediamine;

(4) Typical crystal test with palladous chloride ethlenediamine;

(5) Mandelin's color test.

There is an abundance of expert testimony in the record to the effect that better practice would require a chemist to make additional tests before a positive finding would be acceptable. However, all witnesses agreed that a positive result on the five tests given by Smith would be sufficient to support a positive finding of phenylbutazone.

We do not attempt to detail the procedures followed in the making of these tests, but rather concern ourselves with the results obtained.

Smith testified that he did the Vitali's color test on a part of the sample with a positive result, being a color change to black or bluish black, thereby indicating the presence of phenylbutazone.

Cusick and Chinn testified that they had each observed the Vitali's test and its positive indication of phenylbutazone. Of the results Cusick said, "It was the strongest one I have ever seen." Chinn said, "The Vitali's test that we made on Saturday night was the strongest Vitali's that I have ever seen."

Appellee Peter Fuller attacked the positive Vitali's test by contending that there were other chemicals that would produce a positive reaction and also that a black-and-white picture made by Smith of his test completely refuted the positive results claimed. Dr. Gerald Umbreit testified that a great number of chemicals would produce a positive Vitali's test. Yet, he admitted to the Commission that very few of them would ordinarily be found in the urine of a horse. All witnesses agreed that phenylbutazone produces a positive Vitali's test. John L. McDonald, Director of the Illinois Bureau of Racetrack Police Laboratory, when questioned about the black-and-white picture of Smith's Vitali's test, testified that the picture confirmed neither the presence nor absence of phenylbutazone.

Smith testified in regard to the results of the spectrophotometric curves as follows:

"Q  Mr. Smith, is there any question in your mind about the DK–2 curve which is Exhibit Number 6, center of Exhibit Number 6 in the Stewards Hearing being a phenylbutazone curve?

A  None whatsoever.

Q  Base and acid?

A  Both curves to me were characteristic of phenylbutazone at the time I made them. * * *.

Q  Has there ever been any doubt in your mind that these curves were produced by phenylbutazone?

A  None whatsoever."

Cusick, the laboratory supervisor, testified that there was no doubt in his mind that both curves were phenylbutazone curves.

Witness Lewis E. Harris, a highly qualified racing chemist, after examining the Smith spectrophotometric curve, testified as follows:

"Q  Does the fact that there was an acid curve produced in this case, is that acid curve consistent with phenylbutazone?

A  Yes.

Q Does the fact that there is no minimum on the curve, alkaline curve produced by Mr. Smith, does that detract from your opinion that the testing he did was sufficient to indicate the presence of phenylbutazone?

A No."

George Jaggard, another racing chemist, after an examination of the Smith curve, testified:

"Q Mr. Jaggard, do you have an opinion as to whether or not that the alkaline curve on that page was produced by phenylbutazone?

A Yes, I do.

Q And what is that opinion?

A I think it was produced by phenylbutazone."

The accuracy of the tests with the resultant curves was seriously questioned, the question being predicated in part on the fact that one curve did not have a minimum reading, thereby indicating that a rather serious mistake had been made in the procedural and mechanical aspects of the test.

Appellee's expert, Dr. Hans H. Jaffe, a spectroscopist, examined the curves that resulted from Smith's test. He detailed the mechanics and theory of the spectrophotometric curve and the numerous defects and errors detected by him in his examination of the Smith curves. However, Jaffe, after considering these defects and errors, testified:

"A * * * The acid curve does resemble that of phenylbutazone. * * *."

  *   *   *   *   *   *

"Q * * * can you state individually if these (curves) have any meaning as far as the identification of phenylbutazone?

A I cannot, of course, say that these curves demonstrate that there was no phenylbutazone. This is a deter-

mination that is pretty hard to make. But as far as I can see, they do not demonstrate the presence of phenylbutazone in these specimens."

This witness further testified that he could not say that the curve was not caused by phenylbutazone. The witness James L. McDonald, after studying the curves that resulted from the Smith test, testified that they did not affirm or disaffirm the presence of phenylbutazone.

Of the crystal tests Smith said:

"Q Was there any question in your mind about the results of these crystal tests?

A No sir, none whatsoever.

Q Have you concluded from those crystal tests that they were what?

A I concluded from the series of tests that the sample contained phenylbutazone and the characteristic crystals were concluded to be from phenylbutazone with this particular agent."

While the crystal tests were in progress Smith made several pictures of the crystal formations with a Polaroid camera. These pictures were filed in the record at the time Smith testified. Characteristic crystals produced by the tests were not readily, if at all, identifiable in the pictures. Appellee seeks to discredit Smith and the positive showing of these tests because the pictures did not depict the crystals and, consequently, Smith could not have observed the formation of these characteristic crystals.

George Jaggard, a racing chemist with more than fifty years of experience, testified that these crystal tests required at least fifteen minutes to complete, while a picture of the process would represent only one thousandth of the whole and, therefore, was not very representative of what you see. Appellee's witness, Dr. Gerald Umbreit, also testified that crystals were constantly changing during the test, and that a picture would show only one phase of the test. Dr. Umbreit also testified that even with the

help of a professional photographer he had encountered serious difficulties in getting acceptable pictures. In one instance he had made fifteen to twenty attempts before he was satisfied with the picture. Appellee's witness, John L. McDonald, after examining the Smith pictures, testified that they neither affirmed nor disaffirmed the presence of phenylbutazone.

Smith had the following to say in regard to the Mandelin's color test:

"A * * * These color tests were conducted along with a known. And the known gave the same results as the sample did.

Q   By the known, you mean that you take a substance that you know to be or to contain phenylbutazone, and run the tests along with this in the unknown substance, is that right?

A   That's correct.

Q   And then you compare them as you run your tests?

A   (Affirmative nod.)

Q   Is that right?

A   That's correct.

Q   And then, this test was positive?

A   For Mandelin's reagent color.

Q   Can you describe how positive?

A   Unquestionably.

Q   Was that the degree of certainty in all the tests you conducted?

A   Yes sir."

*     *     *     *     *     *

"Q   Having observed the Mandelin's test, was there any doubt in any of your minds as to whether the Mandelin's test gave a positive reaction?

A   None whatsoever."

Smith made no photographs of this test; whether it was made and the results obtained depend solely upon oral testimony.

The appellee would have this court believe that where no demonstrative evidence is introduced oral testimony alone cannot be considered substantial evidence, and further that the court can no longer rely on what is termed "the honor system" and give any weight to oral testimony where it is not supported by demonstrative evidence.

Cusick and Chinn both testified that they observed the Mandelin's tests performed by Smith and that the tests were positive. Upon cross-examination the evidence was highly contradictory concerning the date, time, and place where each of these witnesses observed the Mandelin's tests. However, no evidence was introduced that might have indicated that either of them did not see a positive Mandelin's test.

On the question of whether the tests performed by Smith were sufficient to indicate the presence of phenylbutazone, Smith testified:

"Q   Mr. Smith, do you have an opinion as to whether or not the series of tests which you ran are sufficient to establish the presence of phenylbutazone?

A   Yes sir. In my report I stated that phenylbutazone was present and from all the tests that I made and as many times as I made them, there was no question in my mind whatsoever it was there."

*     *     *     *     *     *

"Q   Let's try once more, Mr. Smith. Do the results you obtained in running all of these tests, which were observed with you by two of your employees, indicate to you whether or not phenylbutazone was present?

A   They do. There was no question in my mind but what phenylbutazone was present."

Appellee's expert, Dr. Gerald Umbreit, was asked by Commission member Bell if using the tools and tests employed by Smith he could conclude that there was

an indication of phenylbutazone. In answer to this question, he said, "With those tools, I could reach a private conclusion that it might be. But, I would not reach a public conclusion that it is."

This witness also testified that in all of the tests that he had run with different compounds he did not find one that produced a positive in all the tests that Smith had run, with the exception of phenylbutazone.

Witness McDonald testified that he would not report an indicated presence of phenylbutazone even if he should get a positive on all of the Smith tests. His reasoning was that there were other compounds which could produce a positive in some of the tests used; yet, he was unable to name a single compound that would have the same reaction as phenylbutazone on these five tests.

The Kentucky State Racing Commission heard all the testimony in the record now under consideration. The direct examination of the witnesses was generally long and detailed, with the cross-examination being prolonged, repetitious, and argumentative, which facts are amply substantiated by the size of the record. There are numerous contradictions and even contradictions of contradictions throughout this entire record.

The Commission, as the trier of the facts, saw each witness and was in a superior position to evaluate the situation as well as the conduct and demeanor of each witness as he testified; to consider the credibility of the witness; and to determine the weight as between conflicting statements of witnesses or even a single witness.

In cases where an administrative agency acts in its capacity as a trier of the facts, we have held that the findings of the agency are conclusive if supported by substantial evidence.

We will consider first the rule; second, the definition of substantial evidence; and finally, the province of the agency in its evaluation of the evidence heard and considered.

Commonwealth v. Mudd, Ky., 255 S.W.2d 989 (1953). The act establishing the Board of Claims limited judicial review of its orders to a determination of whether "the finding of fact supports the award or judgment." In discussing the authority of the courts of review, we said:

"The Board of Claims was created to provide a method for the processing of claims against the Commonwealth with a minimum of formality and delay, and, as we construe the Act, the Legislature did not intend that the courts would retry a case on conflicting facts after it has been heard by the Board. It was held in Shrader v. Commonwealth, 309 Ky. 553, 218 S.W.2d 406, and reaffirmed in Morrison v. Department of Highways, Ky., 252 S.W.2d 426, that findings of fact by the Board of Claims are conclusive if supported by substantial evidence." In Taylor v. Coblin, Ky., 461 S.W.2d 78, we said:

"If there is any substantial evidence to support the action of the administrative agency, it cannot be found to be arbitrary and will be sustained."

See also Board of Education of Ashland School District v. Chattin, Ky., 376 S.W.2d 693 (1964), and H. Smith Coal Company v. Marshall, Ky., 243 S.W.2d 40 (1951).

Substantial evidence is defined in Chesapeake and Ohio Railway Company v. United States, 298 F.Supp. 734 (D.C.1968), as follows:

" * * * Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Citations omitted.)

In O'Nan v. Ecklar Moore Express, Inc., Ky., 339 S.W.2d 466 (1960), this court said:

" * * * We have defined 'substantial' evidence as being evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable men."

■ The test of substantiality of evidence is whether when taken alone or in the light of all the evidence it has sufficient probative value to induce conviction in the minds of reasonable men. Blankenship v. Lloyd Blankenship Coal Company, Inc., Ky., 463 S.W.2d 62 (1970).

■ The Kentucky State Racing Commission, as trier of the facts, is afforded great latitude in its evaluation of the evidence heard and the credibility of witnesses appearing before the Commission.

The authority of the Bureau of Land Management, Department of Interior, was questioned in Noren v. Beck, 199 F.Supp. 708 (D.C.1961). The Court, in limiting the scope of its review of a ruling of the department, said:

"In the development of the doctrine and rule of administrative finality, courts have uniformly held that it is the exclusive province and function of administrative agencies to draw legitimate inferences of fact and make findings and conclusions of fact, to appraise conflicting testimony or other evidence, to judge the credibility of witnesses and the evidence adduced by the parties, and to determine the weight of the evidence (see cases cited in Schaffer v. United States, 139 F.Supp. 444 (S.D.1956)). See also In the Matter of Adolfe Cartellone, 148 F.Supp. 676 (N.D.Ohio) 1957.

"It therefore follows that the review by this court in this case is to determine from the record whether the exercise of discretion of the agency in rejecting plaintiffs' applications was arbitrary, capricious, discriminatory, unlawful, illegal, or a denial of their rights. The scope of judicial review in this respect does not provide for a trial de novo."

In Wheatley v. Shields, 292 F.Supp. 608 (D.C.1968), the findings of a Coast Guard Hearing Examiner were contested. The Court, in upholding the examiner, said:

"Accordingly, after a thorough consideration of the entire record of the administrative hearing, the decision and order of the Examiner, and the Decision of the Commandant, it is the opinion of this Court that 'substantial evidence' exists upon which a reasonable mind could properly arrive at the conclusion reached below. Regardless of the fact that this Court might have reached a contrary result if it were hearing this case de novo, it is required on the basis of its posture as a reviewing body to affirm the administrative determination. For it must be borne in mind that it is the exclusive province of the administrative trier of fact to pass upon the credibility of witnesses, and the weight of the evidence." (Citations omitted.)

The basic rule in Kentucky was expressed in Irvin v. Madden, 281 Ky. 7, 134 S.W.2d 942 (1939), as follows:

" * * * Under a doctrine too well recognized to require citation of authority, the credibility of witnesses and the weight to be given their evidence are matters exclusively within the province of a jury. A jury may accept the evidence of one set of witnesses to the exclusion of that of another or the evidence of one witness as against the evidence of a number of witnesses and may also judge and determine the weight as between the conflicting statements of a single witness."

Wilson v. Haughton, Ky., 266 S.W.2d 115 (1954), involved the question of evidence required to prove a contract. In that opinion it is stated:

" * * * appellant insists that the verdict was flagrantly against the weight

of the evidence and states that appellee's testimony was vague, uncertain and unconvincing and such testimony, when contradicted by the clear and convincing testimony of appellant, his wife and daughter, does not carry that quality of proof and fitness to induce conviction necessary to sustain the verdict.

"We do not take the view that appellee's testimony is unconvincing. The fact that testimony is denied does not constitute proof of its lack of plausibility. Louisville & N. R. Co. v. Thomas, 298 Ky. 494, 183 S.W.2d 19. Neither is superiority of numbers conclusive in evaluating the testimony of witnesses. Hale v. James E. Hannah Realty Corp., Ky., 249 S.W.2d 733. Here, the jury accepted the testimony of appellee and his witness and fixed the damage for the breach of contract at an amount they believed to be equivalent to his loss. We are of opinion that the verdict should not be disturbed."

H. Smith Coal Company v. Marshall, Ky., 243 S.W.2d 40 (1951), is a workmen's compensation case where the cause of death of an employee was in issue. Dr. Howze testified that death was due to an acute coronary occlusion. Dr. Weiss testified that death was caused by carbon monoxide poison. The Board ruled that the employee's death was due to a coronary occlusion. In sustaining the Board, this court said:

"As competent substantial evidence supported the Board's finding that Mr. Marshall's death was due to a coronary occlusion rather than from carbon monoxide poisoning, the circuit court could not weigh the evidence for itself but was bound by the finding of the Board and was without authority to disturb it."

In Chesapeake & Ohio Railway Company v. United States, 298 F.Supp. 734 (D.C. 1969), the rule is stated as follows:

"In determining whether the findings of the Commission challenged by plaintiffs are arbitrary or capricious or unsupported by substantial evidence, the Court is not free to substitute its judgment for that of the Commission as to the weight of the evidence or the inferences to be drawn from the evidence."

This court, after having considered the entire record and the law of the case as set out herein, finds and now holds that there was an abundance of substantial evidence supporting the findings and rulings of the Kentucky State Racing Commission.

The Franklin Circuit Court ruled that there had been no denial of due process of law or arbitrary action on the part of the Kentucky State Racing Commission. This court, upon its consideration of the record, finds nothing to indicate that this particular ruling of the Franklin Circuit Court was erroneous.

The judgment is reversed with directions to set it aside and enter one sustaining the order of the Kentucky State Racing Commission.

All concur.