Richard E. HUGHES, Appellant,

v.

KENTUCKY HORSE RACING AUTHORITY, Successor to the Kentucky Racing Commission,[1] and Kentucky Personnel Board, Appellees.

No. 2002–CA–002580–MR.

Court of Appeals of Kentucky.

April 23, 2004.

1. The Kentucky Racing Commission was abolished, re-created, restructured, and re-named the Kentucky Horse Racing Authority by Executive Order 2004–030, dated January 6, 2004.

Herbert L. Segal, Everett C. Hoffman, Segal Stewart Cutler Lindsay Janes & Berry, PLLC, Louisville, KY, for appellant.

J. Bruce Miller, J. Bruce Miller Law Group, Louisville, KY, for appellee Kentucky Horse Racing Authority.

No Brief for appellee Kentucky Personnel Board.

Before MINTON and SCHRODER, Judges; MILLER, Senior Judge.[2]

## OPINION

MINTON, Judge.

Richard E. Hughes appeals the decision of the Franklin Circuit Court that reversed the order of the state Personnel Board. The Personnel Board found the Kentucky Racing Commission's (KRC) termination of Hughes's employment for misconduct to be excessive and modified punishment to a thirty-day suspension without pay. The circuit court disagreed, ruling that the Personnel Board had acted arbitrarily. We reverse the circuit court.

Until his termination by KRC, Hughes was an employee of that agency holding

---

**2.** Senior Judge John D. Miller sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statute (KRS) 21.580.

the full-time merit position of Racing License Inspector. At that time, he was a sixty-nine-year-old African–American man, who described himself as having worked around thoroughbred horse racing for more than fifty years.

KRC notified Hughes by letter dated August 17, 2000, that he had been placed on special leave with pay effective August 18, 2000, pending an investigation of charges that he had engaged in terroristic threatening while working at Ellis Park, a thoroughbred track located in Henderson, Kentucky, and that he had brought a firearm to work at Ellis Park. In a second letter dated August 31, 2000, KRC notified Hughes of its intention to dismiss him effective September 19, 2000, for these charges. The letter stated that KRC found probable cause to believe that he had threatened the life of Gerard O'Brien, a trainer at Ellis Park, in a parking lot at Ellis Park on August 6, 2000. The letter further stated that on August 9, 2000, Hughes had repeated this death threat to David Paulus, another horse trainer at Ellis Park. According to the letter, these threats violated 101 Kentucky Administrative Regulations (KAR) 1:345, Section 1,[3] and 101 KAR 2:095, Section 9.[4] In addition, on August 9, 2000, Hughes brought a gun onto Ellis Park property in violation of Ellis Park's rules and 810 KAR 1:025, Section 3(12)(a).[5] Darrell Williams, head of security at Ellis Park, located a loaded handgun in the passenger compartment of Hughes's car following an interview with Hughes on August 9, 2000, in which Hughes confirmed to Williams that he had threatened to kill O'Brien and that he had a gun with him at the track.

KRC's letter further stated that Hughes's racing license,[6] which permitted him to perform his job duties at the various thoroughbred tracks around the state, had been suspended at a hearing by the Ellis Park Stewards on August 23, 2000.[7] In addition, Ellis Park management had ejected him from the track and refused to allow him further access.[8] The suspension

3. Appointing authorities may discipline employees for lack of good behavior or the unsatisfactory performance of duties.

4. State Workplace Violence Policy, *infra.*

5. The commission in its discretion may refuse to issue a license to an applicant, or may suspend or revoke a license issued, or order other disciplinary measures, on the following grounds:
   (12) Possession on association grounds, without written permission from the commission or stewards, of:
   (a) Firearms[.]

6. KRS 230.310 authorizes KRC to control horse racing in the Commonwealth through the issuance of racing licenses for participants. Virtually everyone who works at thoroughbred race tracks during a race meeting, including racing officials employed by KRC, must carry a valid license for access to the facility and grounds. *See* 810 KAR 1:025, Section 5(8)(a) and Section 8. KRS 230.320 authorizes KRC to deny, revoke, or suspend

the license for anyone who violates any statute, administrative regulation, or condition of KRC. *See* 810 KAR 1:025, Section 3. License disputes are typically dealt with summarily and informally by track stewards, but the licensee has the right to a full administrative appeal to KRC. *See* 810 KAR 1:025, Section 1(2).

7. On August 23, 2000, the three Racing Stewards at Ellis Park ordered that Hughes's racing license be suspended for misconduct for the remainder of the 2000 calendar year. A KRC hearing officer conducted an evidentiary hearing concerning the stewards' order on October 9, 2000, and in an order dated December 27, 2000, recommended that the stewards' order be affirmed by KRC. That suspension is the subject of a separate appeal to the Franklin Circuit Court.

8. KRC recognizes in 810 KAR 1:025, Section 7, the independent "common law rights of associations to eject or exclude persons, licensed or unlicensed, from association

of the license and the ejection barred Hughes from Ellis Park; and this bar would also be recognized and enforced by the other Kentucky tracks, which meant that Hughes would not be able to perform his job at any track in Kentucky.

By agreement between Hughes and KRC, the termination was held in abeyance pending an evidentiary hearing on the license suspension by a KRC hearing officer on October 9, 2000. KRC formally terminated Hughes effective October 13, 2000.

As a classified state employee with status, Hughes appealed the termination to the Personnel Board on December 12, 2000.[9] On February 13, 2001, the Hearing Officer for the Personnel Board conducted an administrative hearing in accordance with KRS Chapter 13B.[10] The Hearing Officer rendered his "Findings of Fact, Conclusions of Law and Recommended Order" on February 21, 2001. By way of background, the Hearing Officer recited verbatim KRC's findings. However, the Hearing Officer's findings of fact diverged significantly from those made by KRC. The Hearing Officer found that even though Hughes admitted threatening to kill O'Brien on August 6, 2000, he actually found no evidence of intent on Hughes's part to follow through with the threat. Furthermore, the Hearing Officer found that a "wounded" Hughes delivered the death threat in reaction to a racially charged retort that O'Brien had aimed at Hughes at the track about two hours before the parking lot encounter on August 6, 2000. The Hearing Officer found that O'Brien said, "I'm not going to be any nigger's Cheshire cat." Further differing from KRC's charges, the Hearing Officer

did not believe from the evidence that Hughes repeated the threat on O'Brien's life to Paulus or Williams on August 9, 2000. As for the presence of the gun in Hughes's car at Ellis Park on August 9, 2000, the Hearing Officer dismissed it as an inadvertent coincidence. The Hearing Officer believed Hughes's testimony that he had a permit to carry a concealed weapon, that he customarily carried the weapon with him as he traveled about the state, and that he had simply failed to stop by the motel to leave his weapon before coming to the track on the morning of August 9, 2000.

The Hearing Officer agreed that KRC had grounds to discipline Hughes for misconduct associated with the work, stating

> (1) Hughes was guilty of misconduct, as that term is defined by 101 KAR 1:345, Section 1, in his use of language during his angry outburst on August 6 which communicated a threat to do physical violence to O'Brien.
>
> (2) Hughes violated 810 KAR 1:[025], Section 3(12), by possession of a firearm on association grounds.

However, the Hearing Officer's conclusions then departed from KRC's in that he concluded that

> (3) Hughes did not violate the state's workplace violence policy [101 KAR 2:095, Section 9](1)(b). Although his words make out a *prima facie* case of terroristic threatening, the evidence failed to establish that the angry remarks, uttered in the context of the parking lot exchange between O'Brien and Hughes, caused O'Brien to have a reason-

grounds." *See also James v. Churchill Downs, Inc.*, Ky.App., 620 S.W.2d 323 (1981) (recognizing the common law right to exclude persons from the track).

9. KRS 18A.095(2).

10. KRS 18A.095(18).

able belief that his health or safety was at risk. The situation strongly implies that O'Brien understood that these were angry words from a black man who had been offended by the use of the word "nigger." O'Brien did not want the situation to go any further, but he registered the remark with the track steward merely as a defensive posture should Hughes continue to protest. The subsequent recitation of the same words, first to Paulus, then to Williams, were out of context. It was here that Hughes made his most serious error by confirming his intention to Williams as a means of underscoring his anger. Yet the Hearing Officer is persuaded he meant nothing more than to communicate the depth of his feeling to Williams, whom he trusted as an old friend who would understand. He seriously miscalculated the position that Williams would be in, as director of security, in hearing the threatening words repeated and confirmed.

(4) The Hearing Officer finds the penalty of termination excessive and erroneous under the circumstances. There are mitigating factors which powerfully influence the evaluation of the seriousness of the offense and the appropriateness of the penalty. Hughes['s] situation is examined under KRS 18A, a statute that requires a just and proper cause.

(5) Grave sanctions should not be applied to the kind of verbal threat that expresses transitory anger rather than a settled purpose to carry out the threat. While it must be recognized that the increasing incidence of workplace violence requires vigilance by any employer, the principles of fairness and just

cause cannot be sacrificed because of the challenges facing management in enforcing policies against aggressive behavior.

(6) On the charges of misconduct, as grounds for termination, the Hearing Officer finds that the penalty of forfeiture of his job is inappropriate for the utterance of angry words to O'Brien in reaction to a racial slur and additional rude conduct during their parking lot conversation. Although Hughes'[s] subsequent handling of the situation magnified the original problem, these complications occurred independent of the original threat and do not convert it into a dischargeable offense.

(7) The possession of a handgun was the result of an oversight. Although [Ellis Park's Chief Security Officer] Williams testified that there have been other occasions of ejecting people from the Park for possession of firearms, there is no evidence to lead the Hearing Officer to believe that such ejections arose from similar circumstances to finding a firearm, sealed in a pouch, in a locked car in the parking lot. While Hughes violated both the KAR regulation and Ellis Park rules, this infraction would not warrant termination of his employment.

(8) The KRC also advocates that discharge is warranted because Hughes has lost the ability to fulfill his job requirements. The ejection from Ellis Park results in being barred from not only that track, but other tracks in the state. This was compounded by the suspension of Hughes'[s] license by the stewards, which also prohibited him from being on the premises, inde-

pendent of the Ellis Park ejection. Either of these circumstances results in Hughes being unable to perform the duties of the license inspector. There are no other administrative jobs available on the relatively small staff of the KRC.

(9) The Hearing Officer concludes that these complications in the ability of Hughes to perform his job do not constitute independent grounds for dismissal. The ejection from Ellis Park is not irrevocable. Although Williams testified that he would not support setting it aside under the present circumstances, he is not the decision-maker. Hughes has made no application to have his ejection lifted and his privilege to return to the track reinstated. The Hearing Officer considers Williams'[s] opinion as simple conjecture. If Ellis Park would reinstate Hughes, he would be able to perform his normal duties. Similarly, as of the writing of these recommendations, suspension of Hughes'[s] license has not been finalized by the KRC. If that Commission were to act in Hughes'[s] favor, another impediment to performing his normal duties would be removed. Even if the suspension is upheld, Hughes may apply for a new license for 2001. This application would have to be reviewed by a panel, who would make recommendations to the KRC. The KRC could well determine that the suspension of Hughes['s] license during 2000 was a sufficient penalty, and permit him to be licensed for 2001. Such a result may be suggested by the stewards['s] failure to recommend that Hughes'[s] license be suspend-

ed for 2001. The testimony at the hearing clearly established that the stewards have such authority and have exercised it in the past.

. . . .

(11) It is recommended that Hughes'[s] termination be converted to a thirty (30) day suspension. Such a penalty should clearly communicate to Hughes that his conduct was inappropriate and that it cannot be justified by his sense of personal offense. There was no evidence that Hughes'[s] job performance was in any other way unsatisfactory, or that he is not capable of improving his conduct and learning the lessons that this wrenching episode impose.

The Hearing Officer concluded that following the thirty-day suspension, Hughes should be immediately reinstated to his former position, or to a position of like status and pay, and otherwise be made whole. KRC filed exceptions to the hearing officer's recommended order, but the Personnel Board adopted all of the hearing officer's findings and recommendations in a final order dated May 15, 2001.

KRC appealed to the Franklin Circuit Court.[11] In an order entered November 22, 2002, the circuit court found a lack of substantial evidence in the whole record to support over-turning the dismissal and concluded, therefore, that the Personnel Board's action was arbitrary. In so doing, the circuit court found:

The record reflects that Mr. Hughes threatened the life of a co-worker while at work on the Ellis Park premises. There is also credible evidence in the record that he repeated this threat to another co-worker and demonstrated his ability to carry out this threat by show-

11. KRS 13B.140 and KRS 18A.100.

ing the loaded weapon concealed in his car. The safety of the workplace is of paramount importance in such circumstances.

The circuit court reversed the Personnel Board and ordered that the KRC's decision be reinstated. Hughes then appealed to this Court.[12]

■ On appeal to this Court, KRC urges us to affirm the circuit court by arguing that its decision to terminate Hughes trumps the conflicting decision by the state's Personnel Board because the General Assembly's grant of authority to regulate horse racing confers on KRC an "over-arching responsibility [ ] to protect the public's interest by continuing and maintaining the integrity, honesty and the orderly conduct of thoroughbred racing." According to KRC, this "over-arching responsibility" exempts KRC from the provisions of the state's merit system. We recognize that KRC is an agency of state government created to regulate the conduct of horse racing and pari-mutuel wagering on horse racing within the Commonwealth.[13] In matters relating to the state's system of personnel administration, however, the General Assembly has made KRC subject to the same statutory provisions as other state agencies, specifically the merit system provided in KRS 18A.005 to KRS 18A.200. Had the legislature intended to exempt KRC from the state merit system, it could easily have done so as it did for other entities of state government in KRS 18A.010(3). From the outset of this case, KRC more realistically ac-

knowledged Hughes's right of appeal to the Personnel Board under KRS 18A.095. It said so when it terminated him. Accordingly, we reject KRC's preemption argument.

■ When reviewing the action of an administrative agency, a court is concerned with whether the agency's action was arbitrary, which is defined as "clearly erroneous"; clearly erroneous means not supported by substantial evidence.[14] "Substantial evidence" is evidence which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the minds of reasonable persons.[15]

■ In reviewing whether an agency's decision is supported by substantial evidence, the reviewing court must adhere to the principle that the agency, as fact finder, is afforded great latitude in its evaluation of the evidence heard and the credibility of the witnesses appearing before it.[16] In addition to the principles established by case law, the judicial review process of Kentucky's administrative procedures act at KRS 13B.150(2) circumscribe the scope of judicial review of factual determinations made in an agency's due process hearing, as follows: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." What constitutes cause for dismissing a merit employee is a fact question for determination by the Personnel Board.[17]

12. KRS 13B.160.

13. KRS 230.225(1).

14. *Kentucky Bd. of Nursing v. Ward*, Ky.App., 890 S.W.2d 641, 642 (1994).

15. *Bowling v. Natural Resources and Environmental Protection Cabinet*, Ky.App., 891 S.W.2d 406, 409 (1994).

16. *Kentucky State Racing Commission v. Fuller*, Ky., 481 S.W.2d 298, 308 (1972).

17. *Perkins v. Stewart*, Ky.App., 799 S.W.2d 48, 51 (1990).

In the case at hand, the Personnel Board properly placed the burden of proof and the ultimate burden of persuasion on KRC to demonstrate by a preponderance of the evidence the propriety of the penalty it had imposed for Hughes's misconduct.[18] Since the Personnel Board found that KRC produced sufficient evidence to sustain a finding of misconduct by Hughes, but found that KRC did not sustain its burden of proving that termination was the appropriate penalty, the issue on appeal is whether the evidence favoring termination was so compelling that no reasonable person could have found facts as the Personnel Board did.[19] Although we might have reached a different result, we cannot say from our review of the record that the evidence compelled different findings.

■■■ An administrative agency's interpretation of its own regulations is entitled to substantial deference.[20] A reviewing court is not free to substitute its judgment as to the proper interpretation of the agency's regulations as long as that interpretation is compatible and consistent with the statute under which it was promulgated and is not otherwise defective as arbitrary or capricious.[21] With that standard in mind, we address KRC's argument on appeal that the Personnel Board misconstrued the state's workplace violence policy regulations as promulgated by the Secretary of the Personnel Cabinet, 101 KAR 2:095, Section 9(1)(a) and (b) and (2)(a) and (c), which provide:

(1) Workplace violence shall be prohibited and include:

  (a) The attempted, threatened, or actual conduct of a person who endangers or is likely to endanger the health and safety of state employees or the general public; or

  (b) A threatening statement, harassment or behavior that gives a state employee or member of the general public reasonable cause to believe that his health or safety is at risk.

(2) Examples of prohibited workplace violence shall include:

  (a) Threats of harm;

  . . . .

  (c) Intimidating, threatening, or directing abusive language toward another person, either verbally, in writing or by gesture. . . .

In an obvious reference to KRS 508.080(1)(a),[22] the Hearing Officer concluded that Hughes's threat "[made] out a *prima facie* case of terroristic threatening." The offense of making a terroristic threat may be complete without evidence that the accused intended to carry out the threat and without evidence that the victim was placed in reasonable apprehension of immediate injury.[23] By comparison, when concluding that Hughes's "terroristic threat" did not violate Subparagraph (1)(b), the Hearing Officer found that Hughes's threat was an expression of "transitory anger" lacking intent on his

**18.** KRS 13B.090(7); *Commonwealth, Transportation Cabinet v. Woodall*, Ky.App., 735 S.W.2d 335 (1987).

**19.** *See Bourbon County Board of Adjustment v. Currans*, Ky.App., 873 S.W.2d 836, 838 (1994).

**20.** *Camera Center, Inc. v. Revenue Cabinet*, Ky., 34 S.W.3d 39 (2000).

**21.** *City of Louisville By and Through Kuster v. Milligan*, Ky., 798 S.W.2d 454, 458 (1990).

**22.** [A] person is guilty of terroristic threatening in the third degree when:
  (a) He threatens to commit any crime likely to result in death or serious physical injury to another person. . . .

**23.** *Thomas v. Commonwealth*, Ky.App., 574 S.W.2d 903, 908–910 (1978).

part to follow through with the act threatened. In further comparison, the Hearing Officer found that the threat did not "cause[ ] O'Brien to have a reasonable belief that his health or safety was at risk." Since the language of Subparagraph (1)(b) differs substantially from that of the terroristic threatening statute by specifically adding the requirement that the threatening statement or behavior "give[ ] a state employee or member of the general public reasonable cause to believe that his health or safety is at risk," we cannot say that the Hearing Officer misconstrued the actual language of Subparagraph (1)(b) when he concluded that Hughes had not violated this regulation because the threat did not actually make O'Brien apprehensive for his own safety at any time. In upholding the Personnel Board's interpretation of its own regulation here, we are not endorsing an interpretation of the regulation that would require evidence of the state of mind of the author of a threatening statement that the author actually intends to carry out the threat or even that the author intends to frighten the victims. It is sufficient that the threatening statement is made causing the victim reasonable apprehension. We do not address the possible applicability of Subparagraph (1)(a) because KRC did not present that argument to the Personnel Board for its consideration.

■ In the final analysis, KRS 18A.095(23)(c) vests the Personnel Board with the exclusive authority, if "[it] finds that the action taken by the appointing authority was excessive or erroneous in view of all the surrounding circumstances," to direct the appointing authority to alter, modify, or rescind the disciplinary action.[24] The Board here found just cause existed to discipline Hughes for misconduct, but further found that a thirty-day suspension was more appropriate than termination based on all the circumstances. The Personnel Board exercised its statutory prerogative to alter or modify Hughes's penalty as excessive. Again, we might have imposed a different penalty, but under the facts as found by the Personnel Board, we cannot say that the decision was arbitrary, capricious, or an abuse of discretion.

In accordance with the foregoing, the order of the Franklin Circuit Court is reversed and the final order of the Personnel Board is reinstated.

ALL CONCUR.

---

24. *See Wilson v. Bureau of State Police*, Ky. App., 669 S.W.2d 18, 21–22 (1984) (interpreting similar language in a prior version of KRS 18A.095) (reversed on other grounds in *Howard v. Transportation Cabinet*, Ky., 878 S.W.2d 14 (1994)).