RENDERED: MARCH 18, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0106-MR

MICHAEL T. PEDEN, AS NEXT
FRIEND OF TRAVIS PEDEN, A MINOR                          APPELLANT


v.
APPEAL FROM WARREN CIRCUIT COURT
HONORABLE STEVE ALAN WILSON, JUDGE
ACTION NO. 20-CI-01306


WESTERN KENTUCKY
UNIVERSITY; THE CAROL
MARTIN GATTON ACADEMY
OF MATHEMATICS AND SCIENCE
IN KENTUCKY; LYNETTE BREEDLOVE,
PhD DIRECTOR, THE GATTON ACADEMY
OF MATHEMATICS AND SCIENCE;
AND JULIA LINK ROBERTS,
EXECUTIVE DIRECTOR, THE GATTON
ACADEMY OF MATHEMATICS AND
SCIENCE IN KENTUCKY                                      APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; CETRULO AND GOODWINE, JUDGES.

CETRULO, JUDGE: Michael T. Peden, as next friend of Travis Peden ("Peden"), appeals the Warren Circuit Court's order denying his motion for injunctive relief following his dismissal from The Carol Martin Gatton Academy of Mathematics and Science ("Gatton Academy") at Western Kentucky University ("WKU"). After reviewing the record and relevant case law, we affirm the circuit court's decision.

## FACTUAL AND PROCEDURAL HISTORY

WKU hosts a high school honors' program on its campus, Gatton Academy, that allows high school juniors and seniors to live on campus and take WKU courses. It is a selective program that requires interested students to apply and, upon acceptance, holds them to a high standard. Peden applied as a high school sophomore and was admitted his junior year. As part of the admission process, Peden was instructed to read the Gatton Academy Handbook (the "Handbook") and sign a Handbook Agreement[1] acknowledging that he read the Handbook and familiarized himself with the contents. In doing so, he further agreed to abide by the rules, regulations, and policies within the Handbook and

_____

[1] Michael T. Peden and Travis Peden signed the Handbook Agreement.

-2-

acknowledged that any breach of such policies would result in his being held accountable to any and all sanctions deemed appropriate, including dismissal.

Importantly, the Handbook included an exhaustive outline of the responsibilities and expectations of Gatton Academy students and the policies each must follow. This included policies surrounding academic dishonesty: *e.g.*, "Any student found to be guilty of cheating, plagiarism, or any other behavior that compromises academic integrity. This includes using unauthorized aid and providing unauthorized aid." Additionally, it clarified that "[t]he term 'cheating' includes, but is not limited to: [u]se of any unauthorized assistance in taking quizzes, tests, or examinations; [d]ependence upon aide of sources beyond those authorized by the instructor . . . ; and or [a]cquisition, without permission, of tests or other academic material belonging to a faculty or staff member of the university." Further, it stated that Gatton Academy may dismiss students upon participation in, encouragement of, or aiding and abetting behavior that obstructs or disrupts orderly educational or administrative operation of Gatton Academy. The Handbook defined such disruptions to include engagement in academic dishonesty, which consists of, but is not limited to, plagiarism, giving or receiving help during an examination, obtaining copies of tests, or scoring devices prior to an examination.

-3-

Peden took an Astronomy 108 course through WKU during his second fall semester in the program. Due to the COVID-19 pandemic, the students took the exams for that course virtually. The syllabus for the course instructed students that the exams would be "open textbook and open notes."

Some students in the course started a GroupMe[2] chat, titled ASTR108, in which numerous students discussed the course. During the midterm exam, on October 6, 2020, someone in the GroupMe realized there was a Quizlet[3] online that contained exact questions from the midterm – word-for-word and in the exact order of the midterm – with the correct answers listed. That person (it is unclear who made this realization and passed it on) sent that Quizlet link to everyone in the GroupMe. Many students in the GroupMe then accessed the Quizlet and copied the exam's answers straight to their midterm.

Peden was one such student. He testified that he accessed the Quizlet when he was close to halfway through the exam and utilized the answers listed in the Quizlet for about half of the questions he had left. Ultimately, he estimated that he used Quizlet for approximately a quarter of his midterm exam.

---

[2] A text messaging app for groups.

[3] Quizlet is a study tool that allows students to create virtual flashcards as well as access premade sets of flashcards other users created.

Once the midterm was over, some students contacted the Astronomy 108 professor to inform him that students accessed the Quizlet – essentially the exam's answer key – during the midterm. Those students also provided some screenshots of the ASTR108 GroupMe that showed some students (including Peden) discussing use of the Quizlet during the midterm.[4] To determine who all had accessed the Quizlet during the midterm, the Physics Department Head sent an email to all students in the course and asked those who were involved to turn themselves in. Peden did not turn himself in. Instead, he waited for the professor to contact him directly to set up a meeting to discuss the accusations.

On October 25, 2020, Peden met with the professor via Zoom. Peden explained that he had not turned himself in after the Department Head's email because he "wasn't sure what [he] wanted to do yet." He further admitted that he knew he shouldn't have done it and that he was pretty sure doing so was an automatic "kick out" from Gatton Academy. During the meeting, Peden pulled up the Handbook and found that, in fact, "academic dishonesty is grounds for immediate dismissal."

---

[4] In the screenshots, you can see that Peden told the other students in the GroupMe that "if you look [stuff] up, use a different device[.]" Someone then sent the Quizlet link and another participant said "I'm pretty sure these are all in order too. . ." Another student added, "We all are gonna get 100 because of this quizlet now hahah" to which someone responded, "wow. this is crazy[.]"

The professor acknowledged that Peden was "very young in life" and that people make mistakes; however, the professor emphasized that actions do have consequences, and he would be giving a score of "0" to everyone he could confirm had accessed the Quizlet during the midterm. Further, he informed Peden that he would notify WKU and Gatton Academy of the infraction. Peden was the only Gatton Academy student involved. All others were solely WKU students.

That same day, after his meeting with the professor, Peden contacted Appellee Dr. Lynette Breedlove ("Dr. Breedlove"), the Director of Gatton Academy and the person in charge of disciplinary matters. Peden informed Dr. Breedlove that he "needed to come clean about something." That night, Dr. Breedlove met with Peden and he largely recounted the details he had told the professor. Dr. Breedlove stated in a memo to her superior, Appellee Julia Link Roberts ("Executive Director Roberts"),[5] that Peden "realized his actions were a bad idea" after using the Quizlet on several questions. He also acknowledged that he was "probably going to get caught." Dr. Breedlove further explained in the memo that during her meeting with Peden, "it was very clear that . . . [Peden] understood his actions were cheating and violated [Gatton Academy's] policy."

---

[5] Julia Link Roberts is the Executive Director of Gatton Academy.

Dr. Breedlove sent Peden home that night and scheduled the dismissal hearing for the next day.[6]

The next day, Dr. Breedlove followed the "Procedure for Dismissal Hearing," as outlined in the Handbook. In doing so, Dr. Breedlove informed Peden of the conduct and evidence supporting the allegations and allowed Peden to present his side of the case. After the meeting, Dr. Breedlove followed up with a Written Notice of Policy Violation, in which she weighed the evidence and cited that Peden stated he "accessed Quizlet and realized the questions and answers were directly from the test" and then "used the Quizlet for part of [his] answers on the exam." She then detailed the specific policy violations in question – directly from the Handbook – and stated that Peden's actions constituted academic dishonesty. She then informed Peden that because Gatton Academy has a zero-tolerance policy for such actions, he was immediately dismissed.

Dr. Breedlove further notified Peden that per the Handbook, he could appeal the decision by submitting a letter of appeal to Executive Director Roberts. Following this guidance, Peden appealed. That appeal letter, Dr. Breedlove noted, took a different tone than his discussions with the professor and Dr. Breedlove. Instead of maintaining that he had acted inappropriately and "regrett[ed] it so

---

[6] By this point, Michael T. Peden, Travis's father, was aware of the situation and attended the hearing.

much," he then claimed that what he did was not actually "wrong" or "cheating" at all because, he claimed, it was never explicitly unauthorized. Despite Peden's new approach, on October 30, 2020, Executive Director Roberts notified him that his dismissal would be upheld. Executive Director Roberts emphasized that Peden had accessed questions on the test while completing the test, which was not acceptable.

The next month, in November 2020, Peden filed this action seeking reinstatement in Gatton Academy. Peden argued that Gatton Academy's decision to dismiss him was arbitrary and capricious and supported by neither fact nor law. Further, he sought an injunction to enjoin the Appellees from dismissing Peden. The circuit court held a bench trial on those claims in January 2021, during which Peden, Dr. Breedlove, Executive Director Roberts, and the professor testified to the facts presented above.

Following the bench trial, the circuit court denied both claims, finding Gatton Academy's decision to dismiss Peden was not arbitrary and capricious and therefore an injunction was not proper. On appeal, Peden first argues that his use of the internet during the exam was not "cheating" because there was not an express restriction or prohibition on such internet searches. Second, Peden argues the decision to disenroll him was arbitrary, capricious, and unreasonable.

## STANDARD OF REVIEW

Generally, our standard of review in administrative appeals is as follows:

> The purpose of judicial review of an appeal from an administrative agency is to ensure that the agency did not act arbitrarily. *Baesler v. Lexington-Fayette Urban County Government*, 237 S.W.3d 209 (Ky. App. 2007). If the Court concludes that the agency applied the correct rule of law to the facts supported by substantial evidence, the final order of the agency must be affirmed. *Bowling v. Natural Resources and Environmental Protection Cabinet*, 891 S.W.2d 406 (Ky. App. 1994).

*Alvey v. Davis*, 583 S.W.3d 20, 23 (Ky. App. 2019).

An appellate court's role is to review administrative decisions, not to reinterpret them. *Johnson v. Galen Health Care, Inc.*, 39 S.W.3d 828, 833 (Ky App. 2001) (citing *Jones v. Cabinet for Human Resources*, 710 S.W.2d 862, 866 (Ky. App. 1986)). A circuit court must uphold an administrative agency's decision if it is supported by substantial evidence in the record. *Id.* Our role on appeal from the circuit court, however, "is to determine whether or not the circuit court's findings upholding [Gatton Academy's decision] are clearly erroneous." *Id.* (citing CR[7] 52.01).

---

[7] Kentucky Rule of Civil Procedure.

## ANALYSIS

First, Peden argues that his actions did not constitute "cheating." Gatton Academy disagreed. In determining whether the circuit court adequately analyzed Gatton Academy's conclusion, we must analyze its findings for clear error. Factual findings are not considered clearly erroneous if they are "supported by substantial evidence." *Gosney v. Glenn*, 163 S.W.3d 894, 898 (Ky. App. 2005) (citations omitted). Our Supreme Court has defined substantial evidence as "evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable men." *O'Nan v. Ecklar Moore Exp., Inc.*, 339 S.W.2d 466, 468 (Ky. 1960); *see also Kentucky State Racing Comm'n v. Fuller*, 481 S.W.2d 298, 308 (Ky. 1972).

As the circuit court noted, the essential underlying facts regarding Gatton Academy's decision to dismiss Peden were not disputed. Peden admitted that he accessed the Quizlet link another student sent to him (*i.e.*, a copy of the exam with answers) while taking his midterm and used those answers to complete 25% of the exam. The professor's testimony from the bench trial clarified that although the exams were "open textbook and open notes," that did not include going online during an exam to find answers. Yet, that is what Peden did for a quarter of his exam.

Once the professor confronted Peden about these actions, Peden expressed remorse and stated that he regretted using Quizlet. He acknowledged his participation in the GroupMe during the exam and confirmed that cheating was grounds for an automatic dismissal. Peden then stated that if he got kicked out, it would be "all his fault." At no point during his initial discussions with the professor or with Dr. Breedlove did Peden claim that he thought Quizlet was allowed.

Moreover, Peden did not dispute that he participated in the GroupMe with other students during the midterm, discussed the existence of a copy of the midterm, and then accessed that copy for use during his exam. Dr. Breedlove and Executive Director Roberts detailed that those actions, in conjunction with using some of the test answers as his own, constituted grounds for Peden's dismissal. Gatton Academy considered all of this evidence and determined that Peden was academically dishonest, which the Handbook clearly stated was grounds for dismissal. Therefore, the circuit court's determination that the agency's decision was based on substantial evidence was not clearly erroneous.

Second, Peden claims Gatton Academy's decision to disenroll him was arbitrary, capricious, and unreasonable. This Court has explained that, in an administrative law context, "the courts frequently use the terms . . . interchangeably." *Oldham Farms Dev., LLC v. Oldham Cty. Plan. and Zoning*

*Comm'n*, 233 S.W.3d 195, 196 (Ky. App. 2007) (citing *Ridge Realty Co. v. Oldham Cnty. Plan. and Zoning Comm'n*, 497 S.W.2d 432, 432 (Ky. 1973)). Additionally, "an agency's decision is deemed reasonable if it is supported by substantial evidence." *Id.* (citing *City of Louisville v. McDonald*, 470 S.W.2d 173, 179 (Ky. 1971)). "The fact that the evidence before an agency would allow alternative reasonable decisions does not give a reviewing court the right to substitute its judgment for that of the agency." *Id.* (citing *Fuller*, 481 S.W.2d at 309).

Peden argues that because he was the only student dismissed, Gatton Academy acted inconsistently, and therefore not reasonably. However, to determine whether Gatton Academy acted consistently, we need not look to the action of a separate entity (here WKU). Instead, we must compare how Gatton Academy acted toward Peden versus how Gatton Academy acted toward other Gatton Academy students. Here, as discussed, Peden was the only Gatton Academy student involved. Although the professor proved 18 other students cheated on the midterm, Peden was the only Gatton Academy student who committed such offenses.

As discussed, Gatton Academy had stricter requirements than WKU, which Peden agreed to when he started the program the year before. Consequently, he received a "0" on the exam (like the WKU students) but was also

dismissed according to the Handbook. The Handbook clearly stated that aiding and abetting behavior that disrupts orderly educational operation of Gatton Academy, which included engagement in academic dishonesty – *e.g.*, giving or receiving help during an examination and obtaining copies of tests – was grounds for immediate dismissal. Although Peden was treated differently than the WKU students, that is not a result of Gatton Academy's inconsistent discipline. It is simply the byproduct of Peden being in a separate, more stringent, program than the WKU students.

Additionally, Dr. Breedlove's testimony made it clear that Gatton Academy's policies regarding academic dishonesty are enforced consistently within Gatton Academy. Dr. Breedlove testified that the semester before the one in question, Gatton Academy dismissed 11 of its students because of academic dishonesty. The circuit court concluded that Gatton Academy considered substantial evidence in making its decision and acted according to its typical procedures, and we agree.

Ultimately, Courts should not disrupt an agency's findings "unless the agency's decision is arbitrary and capricious." *McManus v. Kentucky Ret. Sys.*, 124 S.W.3d 454, 458 (Ky. App. 2003); *see also Stout v. Jenkins*, 268 S.W.2d 643, 645 (Ky. 1954). As discussed, there was sufficient factual proof for Gatton Academy to dismiss Peden; and Gatton Academy consistently carried out its policy

of dismissing students found to have cheated or otherwise been academically dishonest.  We find the circuit court's decision to uphold Gatton Academy's determination was supported by substantial evidence in the record and therefore was not clearly erroneous.  *Johnson*, 39 S.W.3d at 833.

## CONCLUSION

For these reasons, we find the circuit court's decision was supported by substantial evidence and not clearly erroneous; therefore, the circuit court order denying Peden's motion for injunctive relief is AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Matthew J. Baker
Bowling Green, Kentucky

BRIEF FOR APPELLEES:

Ena V. Demir
Thomas N. Kerrick
Bowling Green, Kentucky