RENDERED: DECEMBER 2, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0045-MR

DONNA MOLYNEAUX                                                           APPELLANT

                        APPEAL FROM NELSON CIRCUIT COURT
v.                      HONORABLE CHARLES C. SIMMS, III, JUDGE
                        ACTION NO. 15-CI-00353

CITY OF BARDSTOWN                                                          APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  DIXON, JONES, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Donna Molyneaux appeals from the judgment of the

Nelson Circuit Court, which upheld the decision of the City of Bardstown (the

City) on what alterations she could make to her property that was located within

the Bardstown Historic District (the District).  The circuit court denied her petition

for a declaration of rights, and granted the City's counterclaim requiring Donna to

remove unapproved improvements to her property.  We reverse and remand.

Reversal is warranted because the Bardstown Historical Review Board (the Board) failed to act properly within the authority delegated to it by the City. The Board failed to make essential factual findings, delegated its fact-finding function to its staff, and arbitrarily made rulings that were not based upon factual findings. In making such rulings, the Board did not appropriately apply the guidelines contained in the *Bardstown Historic Review Manual* (the Manual).[1]

While the Board purported to approve the alterations sought by the applicants, the Board instead declared that the materials utilized in the replacement components were required be the same as the original materials being replaced (*i.e.*, wood for wood, vinyl for vinyl). The Board then tasked staff members to: (1) make factual findings as to what materials were presently on the building; and (2) determine what replacement materials could be used.

The Board had no authority to allow staff members to make final decisions on this matter and its action could not be sanctioned by the applicants' acquiescence. The City, in approving the Board's recommendation to grant the applicants a Certificate of Appropriateness (COA), compounded the error. The circuit court abused its discretion in upholding the action of the City under these

---

[1] Bardstown Historical Review Board, *Bardstown Historic Review Manual* (2012), https://ncpz. com/pdf/bardstownhistoricdistrictdesignreviewmanualrevised3-12-2012.pdf. If we are discussing multiple versions of the Manual, we may refer to it more specifically as the 2012 Manual.

circumstances as there were no proper factual findings and legal conclusions for it to review, and the Board's application of the guidelines contained in the Manual was so oversimplified and inaccurate as to make its actions arbitrary.

The Board needed to make the requisite factual findings itself, apply the relevant guidelines in the Manual in light of those factual findings, and then make a recommendation to the City as to whether the COA should be granted or denied. The Board completely abrogated its responsibilities, requiring a new review before the Board of the application for a COA.

**RELEVANT ZONING REGULATIONS AND MANUAL PROVISIONS**

The City of Bardstown was settled in 1780 and has a long history of historic preservation. In 1976, it became one of the first communities in the nation to adopt historic zoning and in 1985 first developed written historic design guidelines. Manual at 1-2.

In 1996, the City adopted the Zoning Regulations for Bardstown, Bloomfield, Fairfield, New Haven, and Nelson County, Kentucky (Zoning Regulations).[2] The Zoning Regulations provide for the creation of historic districts

---

[2] Chapter 15 of the Zoning Regulations as amended, which is pertinent here, is accessible at https://cms6.revize.com/revize/bardstownky/Departments/Historic%20Preservation/Article%2015%20-%20Historic%20Zoning.pdf. The Zoning Regulations were adopted as amended by the City via Ordinance 608 which can be accessed at https://cms6.revize.com/revize/bardstownky/document_center/Historic%20Preservation/608.pdf. Ordinance 608 altered language referring to the planning commission to reference the City instead in Zoning Regulations 15.611, 15.612, 15.613, and 15.7. For a list of helpful documents relevant to the zoning of the

and created the District, the purpose of which was, among other things, to protect structures of "substantial historic significance" from "degradation," conserve and improve them by maintaining "the exterior design of these buildings, structures or places in a manner appropriate to the preservation of the historical heritage, charm and beauty of . . . Bardstown . . . and to assure that new structures and uses within Historic Districts will be in keeping with the character to be preserved and enhanced." Zoning Regulations 15.1.

Pursuant to Zoning Regulations 15.4, the Board was created. Under Zoning Regulations 15.42, the Board was given certain powers and a number of responsibilities, including the requirement that:

> Each Historical Review Board shall adopt and make public written guidelines for use in making recommendations on requests to alter, demolish, relocate or add to a designated property or to build a new structure in the Historic District. The guidelines shall include the United States Secretary of the Interior's Standards for Historic Preservation Projects,[3] and the historical Review Board may adopt additional guidelines.

---

Bardstown Historic District, *see generally Historic Preservation*, Bardstown (Jun. 10, 2022, 12:33 PM), https://www.cityofbardstown.org/government/historic_preservation/index.php/.

[3] It appears that either this is a misnomer, or the name of this document has changed over the years as it has been revised. We are not sure which of two documents is being referenced. The Manual references the *Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for Preserving, Rehabilitating, Restoring, and Reconstructing Historic Buildings* (*Secretary's Standards for Historic Properties*) with an outdated link. The current version is *Secretary's Standards for Historic Properties*, United States Department of the Interior National Park Service Technical Preservation Services Washington, D.C. (2017), https://www.nps.gov/orgs/1739/upload/treatment-guidelines-2017-part1-preservation-rehabilitation.pdf. The Manual also references the *Secretary of the Interior's Standards on*

-4-

There have been three versions of the Manual, which is the document adopted through the efforts of the City and the Joint City-County Planning Commission of Nelson County that contains the guidelines that the Board must follow. The Manual was adopted in 2008 as an update to the historic design guidelines and then was revised in 2012 and 2018.[4] We cite to the 2012 version of the Manual as it was in effect when the applicants applied for a COA.

Pursuant to Zoning Regulations 15.61(A), approval of the Board is required before four different types of activities can take place: (1) activities requiring a building permit; (2) exterior alteration of a structure not requiring a building permit; (3) major site or landscaping alterations not requiring a building permit; and (4) applications to erect a sign(s). Under category (2), at issue here, exterior alterations include "installation of siding and . . . window replacement." Zoning Regulations 15.61(A)(2).

The application process is detailed in Zoning Regulations 15.61(B)(1) and includes the requirement that the applicant shall file, where appropriate, "elevation photographs or perspective drawings showing . . . all such existing structures as are within one hundred (100) feet of . . . the property in the Historic

_Rehabilitation_ (_Secretary's Standards on Rehabilitation_), with the latter attached as an appendix. This latter document appears in 36 Code of Federal Regulations (C.F.R.) § 67.7(b).

[4] As noted on the cover of the 2018 Manual, the Manual was adopted on May 12, 2008, amended on March 12, 2012, and amended January 23, 2018.

District." The procedural process is detailed in Zoning Regulations 15.61(B)(2)

and includes in relevant part:

> In its review of the material submitted, the Historic
> Review Board shall review for compliance with adopted
> guidelines, examine the architectural design and the
> exterior surface treatment of the structures on the site in
> question, the relationship between the structure or site
> and the others in the area, and other pertinent factors . . . .
> The Board shall vote to approve or disapprove a
> completed application within sixty (60) days after the
> application is filed with the Administrative Official.
> Provisional or conditional approval may be given to an
> application by the CLG Director based on apparent
> compliance with adopted guidelines. This provisional or
> conditional approval must be subsequently affirmed by
> the Historic Review Board. An applicant who has
> conditional or provisional approval may proceed with the
> activity at their own risk.

If the alterations affect "property in a Historic District . . . that person shall apply

directly to the Historic Review Board" for approval, and if the Board recommends

approval, the City then issues a COA.[5]  Zoning Regulations 15.611.  If the Board

disapproves, it will make a report regarding what needs to be changed to conform

to its regulations and the applicant can choose to appeal to the City, in which case

hearings will be held and the City will then determine whether to approve the

---

[5] On the face of it, Zoning Regulations 15.611 does not give the City any discretion to decline to issue a COA that the Board has recommended, as it indicates that after the City receives the Board's recommended written approval that the City "shall promptly cause a Certificate of Appropriateness to be issued to the applicant and shall at the same time transmit a copy of said Certificate of Appropriateness to the Administrative Officer."

-6-

COA; if the City does not approve the COA, the applicant may appeal this decision to the circuit court. Zoning Regulations 15.612. If the Board fails to act within thirty days of the completed application without a mutual written agreement between the Board and the applicant for an extension of time, the application is deemed approved. Zoning Regulations 15.613. These steps are also summarized in the Manual at 9-11. "Ordinary repairs and maintenance may be undertaken without a Certificate of Appropriateness provided this work on . . . a property in a Historic District does not change its exterior appearance." Zoning Regulations 15.9.

If work is conducted on a structure within the District that is either inconsistent with or being performed without a COA, the administrative officer shall issue a stop work order and work is to cease. Zoning Regulations 15.611. The Manual clarifies that if a violation is found, a stop work order is issued and a notice of violation is mailed to the property owner citing "the violation and necessary action and deadline for compliance" but "[i]f the work continues without a COA and the owner fails to obtain a COA, then the Planning Commission will take action in Circuit Court to cause compliance." Manual at 11.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2015, Richard and Donna Molyneaux (the Molyneauxes) decided they wanted to make some alternations to their townhomes located at 220 and 222

West Broadway, Bardstown, Kentucky (the townhomes) which they leased to renters. The townhomes are located in a building at the corner of West Broadway and North 5th Street, which is near the edge of the District.

The building containing the townhomes is not itself historic, having been constructed in 1988. However, according to representations the City made during oral argument, when the townhomes were designed and constructed, they would have needed to meet the relevant District rules to maintain the historic look of the District that were in effect at that time.

## I.  APPLICATION AND BOARD'S APPROVAL

On May 4, 2015, Richard, *pro se*, submitted a COA application as required by the Zoning Regulations on behalf of himself and Donna, requesting alterations to the exterior of the building and paid the sixty-dollar application fee. Richard sought to cover all exposed wood trim with siding, including windows, soffits, and garages; cover the back dormer with siding; replace the gutters; replace the windows; and replace the wood fence with a white vinyl fence to match the neighbors' fence. Richard noted that the color tan would be used for the siding, gutters, and windows, and attached a card for a vinyl siding contractor.

In the Historic Standards Compliance Review form (the Compliance

Form), staff reviewed the application considering the standards.[6]  Color pictures of

the townhomes were included, which depict a two-story building on a corner lot

which is mostly composed of brick, with some siding in the back of the building,

and a detached garage.[7]  Although it is difficult to tell definitively from the

---

[6] The Compliance Form listed specific standards taken from the Manual in one column and then a review in a second column discussed how the proposed changes fit or did not fit the standards. However, a problematic issue in such a review is that the Compliance Form listed the standards from the 2008 version of the Manual, rather than the applicable 2012 Manual.  We will discuss the Compliance Form's recommendation on various guidelines in more detail when discussing whether the Board properly applied the relevant standards.

[7] These townhomes (located at 220 and 222 West Broadway) are on the corner, making two of their four sides visible from the streets they front; we describe them based on our interpretation of the photographs.  For ease we will label their sides as follows:  Side 1:  the front side of the building which faces West Broadway; Side 2:  the left side of the building which faces North 5th Street; Side 3:  the back side of the building which is opposite of Side 1 and only visible on the approach from North 5th Street; and Side 4:  the right side of the building opposite of Side 2, which connects to the adjoining townhomes.  Sides 1 and 2 are fully brick and half of Side 3 (3A), the side closer to the street, is brick.  The other half of Side 3 (3B) is covered in white siding which appears to be wood siding.  Side 4 is bisected by the roofline of the middle section of the building which connects to the other two townhomes.  Side 4A (which is visible on the approach toward North 5th Street from West Broadway) is also clad in brick; Side 4B (which is triangular in shape and likely only visible from the back yard) is covered in what appears to be tan vinyl siding.

The bricked walls of Sides 1, 2, 3A, and 4A rise two stories, straight up.  3B is composed of two parts, a first story which is covered by a roof (3B1), and a dormer area which is set so far back in the roof that the bottom of its window abuts the mid-roofline (3B2). 3B2 is perpendicular to 4B, and thus two different kinds of siding meet at a corner.  A privacy fence runs perpendicular to the dividing line between 3A and 3B and parallel to North 5th Street.

Connected to Side 1 and Side 3 to the East is an attached building which contains two other townhomes (218 and 216 West Broadway).  Only a small portion of the attached building which abuts Side 4A is depicted.  It has narrow white siding and it is unclear what its composition is.

The garage appears to be mostly composed of brick, but to have wood siding trim. Where it is located on the property in relation to the townhomes is not shown in the pictures.

-9-

pictures, it appears that the white deteriorating siding depicted is made of wood and at least some of the windows have exterior wood elements.[8] On the form it was noted that the applicant needed to address: (1) the need for replacement of siding and trim; (2) the choice of material for siding and trim; (3) the window type; (4) the use of storm windows; and (5) the fence style, type, and material.

Richard's application was considered at the Board's regular meeting held on May 19, 2015. Richard testified, Board members asked questions and made comments, and a neighbor also testified.[9] It is clear from the audio recording of this meeting that Richard wanted to replace the named items with vinyl components to maintain the building and reduce the upkeep responsibilities. He stated he wanted the properties to look like the contiguous properties and noted that the townhomes were not historic. He explained that his wife desired a vinyl fence to replace the deteriorating wood one, and he thought it would hold up better. He also indicated that most of the existing material on the townhomes was vinyl.

---

[8] It is very difficult to determine the composition of the windows and other elements on the exterior of the building from the pictures in the record, as they show entire sides of the building, rather than focusing on individual elements. However, we generally describe what appears to be depicted. The windows on Side 1 appear to have exterior wood "grids" or "grilles" that cover a single pane of glass (simulating divided light windows), rather than to be divided light windows which house multiple small panes held together by wood muntins. The windows on Sides 2 and 3 do not appear to have such exterior grids; instead, they appear to have grilles between two panes of glass. We cannot tell whether wood "frames" these windows, whether the trim work is made of wood or another material, or the material that composes the gutters.

[9] At oral argument, Donna explained that this neighbor was at that time a member of the city council.

The Board members explained why they opposed the use of vinyl and explained their belief that under the guidelines if the townhomes had wood material, that needed to be repaired, repainted, or replaced with wood. They also explained that if the existing materials were vinyl and deteriorating, it was the owner's choice to replace with vinyl as the replacement with like materials was fine.

The neighbor testified he did not believe that anything on the building was composed of vinyl, indicating that he could see wood dividers on the exterior of the glass. In response, the Board members indicated that someone needed to verify the materials of the townhomes. Rather than continue the hearing, a Board member suggested that the Board could style a motion that would allow Richard to not have to return for another meeting. Richard indicated his understanding, stating: "We'll replace with whatever material's there, the same; I'm good with that and we'll verify what it is."

A Board member stated: "You want to cover the back dormer with vinyl siding so we need to, we just need to, look at all these surfaces and see what the story is on them. And if it is vinyl and you're going to replace it with vinyl, then no one has a problem with that."

Subsequently, another Board member made a motion to recommend the approval of COA-15-19 with the following conditions:

The back dormer, windows, fence and other exterior elements need to be verified as to the material that is currently on the buildings by the staff. If the material is found to be vinyl, they can be replaced with vinyl. If the material is found to be wood, then they either need to be replaced with wood or work with the staff to find other alternative materials that are appropriate. The final design of the fence, which will be wood, can be approved by the staff.

This motion was approved by voice vote. The discussion and ruling of the Board was summarized in the minutes.[10]

---

[10] We rely on our review of the audio recording of the meeting, rather than the minutes, in determining what was discussed, agreed to by Richard, and approved. The minutes are as follows:

> **COA-15-19 [Richard] and Donna Molyneaux, Applicant/Owner** – Chairman Parrish stated that the Applicant seeks approval for the replacement of soffits, gutters, windows, and a fence at 220-222 West Broadway Avenue. Chairman Parrish inquired as to the reasoning for replacement with vinyl. The Applicant responded that he believed it would require less upkeep. Chairman Parrish explained the vinyl was only a temporary solution as vinyl windows will not last as long as wood. Vice-Chairman Bogert explained to the Applicant that placing vinyl over wood can ruin the wood. Coordinator Hawkins suggested that since there was confusion on the types of materials that the Board allow vinyl to be replaced with vinyl, but that if other material were present, they not be replaced with vinyl. After much discussion, Chairman Parrish asked if someone would like to make a motion. Dr. Ballard made the motion to recommend approval for COA#15-19 based on the windows, soffits, and fence being consistent with the window, gutter, and fence standards set forth in Section 4 of the Bardstown Historic District Design Review Manual with the condition that only currently vinyl materials be replaced with vinyl and the final fence design and all replacement materials be administratively approved. Secretary Keene seconded the motion. The motion carried 4-0.

## II.   CITY'S APPROVAL

On May 26, 2015, the City Council summarily reviewed the Board's recommendation for approval of thirteen pending COAs with the conditions the Board imposed.  The City Council approved all the pending COAs.  Among this group, was COA-15-19.[11]  There is no indication that the Molyneauxes attended this hearing.

The COA issued to the Molyneauxes states:  "Work Approved:  1) The replacement of materials with like materials with the condition that <u>ALL</u> the materials used be administratively approved."  It further states:  "****All work*

---

[11] The City Council's minutes summarize its action as follows:

> **HISTORICAL REVIEW BOARD**
>
> The following recommendations from the Bardstown Historical Review Board were presented:
>
>  . . .
>
> >  (f)      <u>COA-15-20</u>.  [Richard] and Donna Molyneaux, Applicant/Owner, proposes to make exterior alterations and replace windows at 220-222 West Broadway Avenue.  Recommendation:  Approval of the replacement of materials with the condition that AL[L] [] materials used be administratively approved.
>
>  . . .
>
> **COUNCILMAN BUCKMAN MOVED TO APPROVE THE RECOMMENDATIONS FROM THE HISTORICAL REVIEW BOARD FOR . . . COA #15.20 . . . .  THE MOTION WAS DULY SECONDED BY COUNCILMAN WILLIAMS AND CARRIED BY A VOTE OF 6 TO 0**.

-13-

[*must*] *be completed within 6 months from date of COA issuance\*\*\* Changes or revisions to approved work requires* [sic] *prior approval. Any additional work will require a separate COA.*"

## III. APPEAL TO THE CIRCUIT COURT/PETITION FOR DECLARATION OF RIGHTS

On June 25, 2015, the Molyneauxes, now represented by counsel, filed a notice of appeal and petition for declaration of rights before the circuit court.[12] The Molyneauxes alleged that the Board "recommended 'approval of the replacement of materials with the condition that ALL of the materials must be administratively approved[,]' . . . [and] orally stated that vinyl would not be approved," leaving "the administrative process open to ongoing interpretation and judgment of officials without direction to the Plaintiffs and without administrative review." The Molyneauxes argued the City's decision was without merit, was arbitrary and capricious, and violated their substantive and procedural due process rights and right to equal protection of the laws. They argued: while the decision

_____

[12] We do not know of any reason why the Molyneauxes could not have filed a new application presenting additional evidence as to the composition of existing materials on the exterior of the townhomes and additional evidence about what was present on the exterior of neighboring properties within the District, and requested specific findings as to specific proposed replacement items, citing the relevant guidelines contained within the Manual and explaining why they believed their proposed replacement components satisfied these guidelines. There is no limitation on how often COA applications can be filed. COA-15-20 specifies that all work must be completed within six months, but it does not specify what needs to be done or mandate that any work must be done. So, at the latest, the Molyneauxes could have waited for their COA to expire and then filed an application for a new one.

-14-

purported to approve their application, it had the practical effect of denying it; recommendations regarding vinyl are outdated; the actions of the Board and City violated their "right to free and unfettered maintenance and use of their real estate, without due process of law"; and the Board and City acted arbitrarily by "repeatedly and routinely permit[ting] the same materials [they requested] to be installed and constructed on other properties within the Historical District, including properties right across the street and right next door to that held by [them]." The Molyneauxes sought to overturn of any part of their application which had actually been denied and a declaration that they could install the proposed materials on their property without hindrance or further review.

The City answered, mediation was ordered, but was ultimately unsuccessful. The case then lingered without additional developments. Two years later, the City requested that it be allowed to file an amended answer and counterclaim. On May 2, 2018, the City's motion was granted.

The City alleged that without approval of the Board or the City, on or about October 27, 2017, the townhomes' windows were replaced, and on or about November 1, 2017, the townhomes' gutters and soffits were replaced or altered.[13]

---

[13] The City did not specify that the composition of the replaced items was inappropriate pursuant to COA-15-20, which had long ago expired, or the Manual. It only specified that the replaced items were unapproved. As discussed earlier, a COA is required prior to any exterior alterations other than ordinary repairs and maintenance. Zoning Regulations 15.611 and 15.9; Manual at 11.

The City requested a temporary restraining order that the Molyneauxes cease all alteration and that an injunction be entered that the Molyneauxes remove all improvements or alterations to the exterior of the townhomes that were not approved by the Board and City and be required to replace these items with materials approved by the Board and City. The Molyneauxes did not file an answer to the City's counterclaim.

The case then lingered again, but two years later after facing dismissal, the parties filed briefs and submitted the matter for a decision. By that time, the Molyneauxes had divorced and, according to Donna, Richard had quitclaimed ownership of the townhomes to her. However, no substitution of parties was made.

Donna argued in her memorandum before the circuit court that: (1) the lack of a recording or transcript from the administrative hearing was fatal to the City's defense; (2) the City's approval with conditions was in excess of their granted powers; (3) there was a lack of substantial evidence supporting the Board's decision where the chairman made the statement that wood lasts longer than vinyl; (4) the townhomes are outside of the regulation because they are not historic properties; and (5) she showed compelling reasons for the COA to be approved as

to vinyl as requested.[14]

As to this last argument, Donna stated that the Molyneauxes submitted photographic evidence to the Board of six other properties in the 200 block of West Broadway, including the two properties on either side of the townhomes that already had vinyl siding, vinyl windows, and vinyl fencing installed. Donna argued that the Board acted inappropriately by ignoring this evidence since the Manual indicates that vinyl may be appropriate if in conformity with other properties. Donna attached to her brief an exhibit containing the photos which were purportedly submitted to the Board and purportedly contained vinyl elements, which were labeled as belonging to the homes located at 208, 210, 214, 216, and 218 West Broadway.

On November 2, 2020, the judgment was entered. The circuit court addressed and rejected all of Donna's arguments, explaining: (1) the lack of a

---

[14] Donna attached to her circuit court memorandum and as an exhibit to her appellate brief select excerpts from a Manual without including the cover sheet. Included in her exhibit are pages 1-2, 6-8, 40, 69, 71-73, 75, 108, and 122, with highlights, underlines, and comments. Having reviewed all three versions of the Manual, it is apparent that she excerpted the original 2008 version of the Manual, rather than the 2012 version of the Manual which was controlling at the time the Molyneauxes applied for the COA. However, she cannot be faulted for this, as apparently the Board also relied on the 2008 version of the Manual as the Compliance Form referenced its standards rather than the standards of the 2012 version. While many provisions are identical, not all of them are. *Compare* Bardstown Historical Review Board, *Bardstown Historic Review Manual* (2008), https://ncpz.com/pdf/bardstown%20historic%20 district%20design%20review%20manual.pdf (2008 Manual) *with* the 2012 Manual *and* Bardstown Historical Review Board, *Bardstown Historic Review Manual* (2018), https://cms6. revize.com/revize/bardstownky/document_center/Historic%20Preservation/BHDRM%20 (5-31-18).pdf (2018 Manual).

transcript was not problematic because the audio recording of the Board hearing was sufficient; (2) granting the application with conditions was appropriate because Richard specifically agreed to the Board's conditions; (3) there was substantial evidence to support the Board's decision based on the Manual's requirements and Richard's agreement to them; (4) the City has appropriate authority pursuant to Kentucky Revised Statutes (KRS) 100.203(1)(e) to regulate districts of special interest, the Zoning Regulations 15.1 specifically sets forth the intent of the Board to assure that new structures in the historic districts will be in keeping with the character to be preserved, and the Manual provides guidelines for applications submitted by those within a historic district and states that changes to non-historic buildings should be consistent with the design of the building and the characteristics of the historic district; and (5) the Molyneauxes failed to show there were compelling reasons to make changes to the building based on changes to the surrounding properties where there were no photographs of the six other properties contained in the administrative record or any reference to such during the Board's meeting.

As for the City's counterclaim regarding the Molyneauxes' replacement or alterations of windows, gutters, and soffits without proper approval, the circuit court noted the Molyneauxes never denied making these changes and determined the City is entitled to injunctive relief. The circuit court then affirmed

COA-15-19, dismissed with prejudice the Molyneauxes' appeal and petition for declaration of rights, and granted the City the injunction. The circuit court specifically required:

> 4. That within ninety (90) days of entry hereof, the plaintiffs shall remove any and all improvements or alterations to the exterior of the structure at 220 and 222 West Broadway that were not approved by the defendant.
>
> 5. That within ninety (90) days of entry hereof, the plaintiff shall bring the subject properties into compliance with the COA as discussed herein. Compliance shall be enforced pursuant to CR 65.06.

Donna filed a motion to alter, amend, or vacate, arguing Richard's statements were taken out of context and he did not consent to anything. She further asked the circuit court to amend its decision regarding the counterclaim as the court made findings that were not in evidence as to the alleged alteration of the property and presumes that those alterations were made in violation, reasoning the judgment did not specify which changes were in violation and which were not. She also asked for a longer period of time in which to bring the building into compliance with the requirements of the injunction.

The circuit court denied the motion. The circuit court noted it reviewed the audio recording again and found the argument regarding Richard's statements to have been taken out of context "to be disingenuous." As to the grant of injunctive relief, the circuit court explained that the Molyneauxes were in

-19-

default for never having addressed the City's counterclaim and did not provide sufficient grounds to have this default set aside. The circuit court stated it would address whether the changes could not be made in ninety days if a contempt hearing were brought.

## PRELIMINARY MATTERS

Before we address the issues on appeal, we address preliminary matters regarding the power of the bureaucracy, how the circuit court action should be treated, and the relevant standards of review.

## I. GENERAL CONSIDERATIONS REGARDING REGULATION OF PROPERTY

We have before us a matter concerning the actions taken by appointed members of a local government board. As noted by Justice Cunningham in *Bullitt Fiscal Court v. Bullitt County Board of Health*, 434 S.W.3d 29, 39 (Ky. 2014), we should rightly be cautious when we see "an increase in the aggregate power of administrative agencies . . . [which], if left unchecked, invites the ascendance of a fourth branch of government – the regulatory state." Here, the Board has a great deal of power in determining what property owners within the District can do with the exterior of their buildings, and we need to ensure that the Board is appropriately acting within the bounds of its lawfully delegated authority.

We recognize that the over-regulation of property can constitute a taking and be addressed through inverse condemnation. *First English Evangelical*

*Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987). *See Goldblatt v. Town of Hempstead, N. Y.*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962) (explaining that government regulation if onerous enough can constitute a taking, with there being "no set formula to determine where regulation ends and taking begins"). "[A] use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose or perhaps if it has an unduly harsh impact upon the owner's use of the property." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 127, 98 S.Ct. 2646, 2660-61, 57 L.Ed.2d 631 (1978) (citation omitted).

## II.    TREATMENT OF THE CIRCUIT COURT ACTION

The circuit court treated the Molyneauxes' action below as an appeal from an administrative agency, and we generally do as well.[15]  As to Donna's argument that the City could not properly file a counterclaim to an administrative appeal, we believe this argument was waived by the Molyneauxes' failure to answer this counterclaim and raise such a defense below.  As Donna conceded

---

[15] The Molyneauxes acted appropriately below in both filing an appeal and filing a petition for a declaration of rights as it was unclear whether an appealable event had occurred where ostensibly they had prevailed in being granted a COA.  *See Whitley v. Robertson Cnty.*, 406 S.W.3d 11, 13 (Ky. 2013) (noting the declaratory judgment process of KRS 418.040 is an appropriate method to seek review where "no appealable event had occurred").

during oral argument, the complained of alterations to the townhomes were indeed made.

We hold that there is a right to directly appeal from a final decision that purports to approve a COA, but in effect denies it. As we will explain further, because Donna's rights are not yet established, there is nothing to declare regarding whether she had the right to make alternations to the townhomes as originally proposed because the COA was approved (therefore eliminating the restrictions to the approval).

## III.   STANDARD OF REVIEW

The Board is an administrative body whose actions are either confirmed or overturned by the City, with review before the circuit court as established by the Zoning Regulations. In reviewing the action of an administrative agency, "this Court generally confines its review to: (1) whether the findings of fact are supported by substantial evidence of probative value; and (2) whether the administrative agency applied the correct rule of law to the facts." *Ford Contracting, Inc. v. Kentucky Transp. Cabinet*, 429 S.W.3d 397, 406 (Ky.App. 2014). Here, where the circuit court upheld the administrative decision, we must determine whether the circuit court's findings are clearly erroneous, keeping in mind that "[t]he circuit court's role as an appellate court is to review the administrative decision, not to reinterpret or to reconsider the merits of the claim,

nor to substitute its judgment for that of the agency as to the weight of the evidence." *500 Associates, Inc. v. Nat. Resources and Environmental Protection Cabinet*, 204 S.W.3d 121, 131 (Ky.App. 2006) (footnote omitted).

Lastly, and perhaps most importantly, we must review whether the administrative action was arbitrary and whether the administrative agency acted properly within its delegated powers. *American Beauty Homes Corp. v. Louisville and Jefferson Cnty. Planning and Zoning Commission*, 379 S.W.2d 450, 456 (Ky. 1964).

We note that:

An administrative agency's interpretation of its own regulations is entitled to substantial deference. A reviewing court is not free to substitute its judgment as to the proper interpretation of the agency's regulations as long as that interpretation is compatible and consistent with the statute under which it was promulgated and is not otherwise defective as arbitrary or capricious.

*Hughes v. Kentucky Horse Racing Authority*, 179 S.W.3d 865, 872 (Ky.App. 2004) (footnotes omitted).

## ISSUES ON APPEAL

Donna argues on appeal that the City and the Board lacked the authority to approve the Molyneauxes' application with non-specific conditions and its actions under Zoning Regulations 15.1 cannot be justified by KRS 82.026, KRS 82.660, or KRS 100.203. She argues she has a fundamental common law and

constitutional right to use her property in the manner she sees fit, the power to regulate her use must be properly authorized, and the City's actions are not justified by any enabling statutes.

## I. NON-HISTORIC HOMES WITHIN THE DISTRICT ARE SUBJECT TO REGULATION BY THE BOARD

Donna first argues that KRS 82.026, which governs the establishment of local historic preservation commissions for the purposes of qualifying for historic preservation funding to protect historic properties, is inapplicable to her building as the townhomes are not historic properties. We disagree.

The federal government in defining "historic property" has included "any . . . historic district . . . included on, or eligible for inclusion on, the National Register[.]" 54 United States Code (U.S.C.) § 300308. The Bardstown Historic District was included on the National Register of Historic Places beginning in 1983 as confirmed by documentation in the National Archives. *Kentucky SP Bardstown Historic District (Boundary Increase & Additional Documentation)*, National Archives (Jun. 10, 2022, 3:16 PM) https://catalog.archives.gov/id/123851496/.[16] The District listing indicates the number of properties in the District that are contributing (historic) and non-contributing (non-historic). Therefore, KRS 82.026 does apply to the townhomes as they are located within the District.

---

[16] The National Register of Historic Places Inventory – Nomination Form for the district is viewable at https://npgallery.nps.gov/GetAsset/5605996b-2277-45ff-93df-b038cd963198/.

## II. THE BOARD FAILED TO MAKE SUFFICIENT FACTUAL FINDINGS

Donna next argues that KRS 82.660, which permits the creation of historic overlay districts, cannot justify the Board's action because the Board did not make specific findings as required, arguing:

> In this case, the [Board] did not make specific findings on the record about its approval of the Appellants['] application that contained a request to use vinyl, what the "conditions" would be for implementation of the approval, what standards would be used, or indeed, whether any of the Appellants['] windows, dormers, and fence were replacing vinyl with vinyl or replacing wood with vinyl. Instead, those items were pawned off on administrative officials outside of the record and not supplemented as to what the basis or criterion for their decisions would be.

Donna argues that despite their submission of photographic evidence concerning vinyl elements on surrounding structures, the Board failed to issue any findings regarding the makeup of the surrounding structures, preventing appropriate review.

"The case law dealing with administrative bodies clearly indicates that it is required that basic facts be clearly set out to support the ultimate conclusions." *Shields v. Pittsburgh and Midway Coal Min. Co.*, 634 S.W.2d 440, 444 (Ky.App. 1982). "[F]indings of fact are essential to support the orders of administrative agencies, at least where the order issued by the agency rests upon a factual determination. This requirement . . . is in keeping with sound reasoning and the weight of authority." *Pearl v. Marshall*, 491 S.W.2d 837, 839 (Ky. 1973).

-25-

> Judicial recognition of strong practical reasons for requiring administrative findings is almost universal . . . . The accepted ideal as stated by the United States Supreme Court is that "the orderly functioning of the process of review requires that the ground upon which the administrative agency acted be clearly disclosed and adequately sustained."

*Id.* (quoting *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943)). "When considering a claim, an administrative officer is not required to provide a detailed analysis of the facts and the law. However, he is required to set forth sufficient facts to support conclusions that are reached, so the parties understand the decision, and to permit a meaningful appellate review." *500 Associates*, 204 S.W.3d at 132 (footnotes omitted).

> The goal of the administrative process must be to [e]nsure uniformity of treatment by administrative agencies to all persons who are similarly situated. Without the application of uniform standards, uniformity of treatment is difficult to achieve. Without specific findings of fact it is difficult, if not impossible, upon review to determine whether the administrative agency has acted arbitrarily or within its powers.

*Pearl*, 491 S.W.2d at 839.

We agree with Donna that the Board erred in failing to make required factual findings, which include: what types materials were present on the exterior of the townhomes (*e.g.*, Was the existing siding wood or vinyl?); where were these materials located on the townhomes, were those locations visible from a public street, and how visible were they (*e.g.*, Was the existing siding on primary or

secondary elevations in the back of the building and could the ground level and dormer siding be seen from the street?);[17] and what types of materials were present on structures and fencing near the townhomes within the District and, if so, how visible were such materials from a street (*e.g.*, Was there vinyl siding on the fronts or sides of adjoining homes?). We agree that the complete lack of any factual findings (other than the undisputed fact that the building was not historic as it was built in 1988 and that the existing privacy fences were made from wood) is problematic as it leaves a reviewing court unable to ascertain whether or not any violation occurred on the part of the owners or whether any actions taken by the Board were in accord with its own Manual.

The Board acted prematurely in making a decision without first resolving the dispute about what materials were on the exterior of the townhomes. It could not properly make a conditional decision to approve the COA without determining what the facts were.

We do not believe that Richard's silence when a Board member discussed drafting an open-ended decision conditioned on staff determining existing materials and what replacement materials were appropriate, rather than

_____

[17] While the City argued during oral argument that the townhomes' location on a corner essentially meant that all of the townhomes' three sides were visible and there was no real fourth side (because there were connected townhomes on the fourth side), no factual findings to this effect were made by the Board.

-27-

making him come back, could function as a "consent" to allow the Board to fully abrogate and delegate its fact-finding responsibilities. We do not believe Richard had any responsibility to request that the Board table the matter until its members had the evidence needed to make factual findings.

The circuit court could not properly review the Board's recommendation as approved by the City, due to the lack of necessary findings. Accordingly, the circuit court's decision was clearly erroneous as it could not properly find that the missing factual findings were supported by substantial evidence. While there was evidence, it did not result in findings. Without findings, the circuit court could not properly review whether the Board applied the correct rules to the facts and properly denied the use of vinyl unless it was replacing vinyl.

As to the lack of factual findings about the nature of adjoining properties, Donna argues that they submitted numerous pictures of neighboring properties to the Board which depicted "vinyl dormers, fencing, and windows that were installed on Broadway, some even right next door to the Appellants" and the Board failed to consider this evidence. Donna is merely repeating what she argued to the circuit court. Donna fails to acknowledge or address that the circuit court made a very specific factual finding that there were no photographic exhibits of

-28-

neighboring properties submitted to the Board based on the administrative record. Donna did not challenge this finding in her motion for reconsideration.

We consider the circuit court's factual finding on this matter to be definitive. While Richard made a reference to neighboring properties having vinyl, there is nothing to indicate that he submitted any photographic evidence or even showed the Board any photos during the hearing that were not submitted into evidence.[18] Similarly, despite vigorous argument before the circuit court and our Court that these photographs were submitted to the Board, Donna has never provided any proof this occurred.[19]

While during oral argument there was debate as to whether the surrounding structures had been altered with the installation of vinyl siding, there was disagreement on this issue.[20] This simply further demonstrates that this issue was unresolved by the Board.

---

[18] We can neither confirm nor deny that these photographs were submitted to the Board. The audio recording does not contain any reference to the photos, but that does not mean that the photos were not submitted.

[19] It is unclear from the Board record whether Donna attended the Board hearing and, therefore, unknown whether she would have any personal knowledge of what was or was not submitted to the Board.

[20] The City represented to the Court during oral argument that just before the historic district was established in 1967, there was a rush to install vinyl siding and other elements which would no longer be allowed, and some adjoining structures might have been "grandfathered in." Donna disagreed, arguing that the buildings on the properties surrounding hers were for the most part of more recent construction. She stated that many adjoining homeowners opted to not apply for a COA and simply installed vinyl elements on their own volition with no enforcement actions being taken against them. Donna argued that this change to the neighborhood justifies her

As Richard argued that contiguous buildings had vinyl components, he put in issue the character of the surrounding buildings, thus requiring findings as to the character of the material on those buildings. Although a lack of proof could perhaps permit a finding that the neighborhood had not changed, it could not justify a lack of findings on this issue.

## III. THE BOARD COULD NOT DELEGATE ITS FACTUAL FINDING RESPONSIBILITY TO ITS STAFF

To explore what delegation is permitted, we review the relevant regulations as enabled by statute. KRS 100.203 generally permits cities to enact zoning regulations. KRS 100.203(1)(e) permits cities and counties to regulate "[d]istricts of special interest to the proper development of the community, including . . . historical districts[.]"

The Zoning Regulations as pertaining to the District, require that the Board in making decisions regarding "Exterior Alteration of a Structure Not Requiring a Building Permit" as set out in Zoning Regulations 15.61A(2) use the process provided under Zoning Regulations 15.61B(2) to "vote to approve or disapprove a completed application" and only references conditional approval as something that may occur prior to the meeting of the Board, with Zoning Regulations 15.611, 15.612, and 15.613 explaining what happens upon approval,

installation of vinyl components, and it is unfair the Molyneauxes were not similarly allowed to install vinyl components when they obeyed the law and properly filed an application for a COA.

-30-

disapproval, or failure to act. The Manual also details the design review process that ends in an approval or disapproval.

While under Zoning Regulations 15.61(B)(2) and the Manual at 10, staff can provisionally approve a project prior to a hearing before the Board, such approval is subject to a final Board recommendation and City Council approval. There is no authorization for staff to be delegated the authority to make a final approval as appears to be what happened here; such an action is in excess and contrary to the delegation of power given to the Board by the City. We agree with Donna that the Board's decision, conditioned as it was to delegate staff to make factual findings and resolve what new materials could be installed on the townhomes, was outside of its power and arbitrary.

While the Board had to act within thirty days of the submission of the COA application or the COA would automatically be approved pursuant to Zoning Regulations 15.613, if the Board believed it could not rule in Richard's favor without further information it could have properly: (1) recommended disapproval based on Richard inadequately documenting what materials he had, what he wished to replace them with, and what the character of the surrounding buildings was; (2) recommended disapproval based on the evidence then before it; or (3) discussed with Richard whether he would be willing to enter into an agreement for an extension of time so as to allow the gathering of additional evidence to clarify

-31-

matters. The Board's solution to proceed, without resolving factual issues and delegating its resolution to the staff, was not authorized and cannot be upheld.

We are very concerned with the practice of delegating decision-making to unappointed and unelected staff who are part of an unaccountable bureaucracy. When such delegation is done, there are no time limitations on how long this process will take and review of the staff's decision-making is not available. Property owners like the Molyneauxes are at the mercy of such staff, with the possibility of being given a never-ending punch list of what they must do to comply.

The Molyneauxes were entitled to a full consideration of their application and a final decision regarding their request to replace existing components with vinyl components. Since factual findings were not made by the Board and could not be made by the staff, a full consideration was never given to what appropriate replacement components would be. Property owners are entitled to finality so that if they disagree, they can properly seek review.

## IV. RELEVANT CONSIDERATIONS IN APPLYING THE MANUAL PROVISIONS TO THE MOLYNEAUXES' APPLICATION

Richard, who was *pro se*, appears to have relied heavily on the Board members' statements that he had to replace "like with like" with the implication being that the Board had no discretion to approve Richard's request to the extent that he would be replacing wood components with vinyl components, before he

"consented" that he would replace existing components with the same materials as were currently there. However, having reviewed the 129-page Manual in detail, it is evident that what needs to be done in each situation is much more complicated and nuanced.

The Manual's guidelines mostly relate to what can appropriately be done to alter historic buildings. The term "historic" is not defined in the Manual and, therefore, we accord it its typical definition. As noted in the introduction:

> *The design guidelines are concerned with <u>all aspects of historic structures</u> and especially with the portions of buildings visible from public view*. Typically, this includes the main building façade facing the street, which includes the most defining features of the property such as porches, primary entrances, windows, and decorative details. *Rear elevations provide more flexibility for* additions or *alterations, since they are generally not readily visible to the public*, and new construction at the rear of buildings is appropriate.

Manual at 7-8 (emphasis added).

However, the Board specifically found that the townhomes were not in a historic building. In the parlance of the Manual and the National Register of Historic Places, the building containing the townhomes was a "non-contributing" structure within a historic district; even if the existing siding was wood, it was not historic wood siding on a historic building.

The Manual discusses that "[i]n reviewing work on non-historic buildings, the HRB's approach is to maintain or enhance their relationship and

-33-

compatibility with adjacent historic buildings and streetscapes." Manual at 7. We believe it would be inconsistent for exterior elements on non-historic buildings to be deemed "historic" simply because that was what a non-contributing building had on its exterior when first built.

Similarly, the *Secretary's Standards for Historic Properties* and *Secretary's Standards on Rehabilitation* say very little about what alterations can or cannot be made to non-historic buildings with the focus being maintaining historic buildings, rather than providing much guidance on alterations to non-historic buildings. The overall tenor when new construction is addressed is that it should be compatible with historic buildings.[21]

---

[21] *Secretary's Standards for Historic Properties* at 26 provides:

> New construction should be appropriately scaled and located far enough away from the historic building to maintain its character and that of the site and setting. In urban or other built-up areas, new construction that appears as infill within the existing pattern of development can also preserve the historic character of the building, its site, and setting.

*Secretary's Standards on Rehabilitation*, 36 C.F.R. § 67.7(b) provides:

> (9) New additions, exterior alterations, or related new construction shall not destroy historic materials that characterize the property. The new work shall be differentiated from the old and shall be compatible with the massing, size, scale, and architectural features to protect the historic integrity of the property and its environment.

> (10) New additions and adjacent or related new construction shall be undertaken in such a manner that if removed in the future, the essential form and integrity of the historic property and its environment would be unimpaired.

One of the projects for which Richard sought approval was the replacement of siding on the backside of the structure, on both the ground floor and on the dormer area which was set back from the edge of the roofline. We examine Richard's request regarding replacement siding to illustrate relevant considerations before the Board regarding application of the Manual. A review of the relevant Manual provisions quickly reveals that Board members' representations to Richard that he would have to replace wood with wood, but if he had vinyl he could replace it with vinyl, were overly simplistic and inaccurate.

We note that the Compliance Form that the staff prepared in advance of the meeting listed the specific guidelines and how the staff believed Richard's application did or did not satisfy the guidelines. While the Compliance Form addressed relevant standards with far more specificity than what the Board did, the Board did not adopt any part of this review, so it cannot serve as factual findings.

---

We note that the Manual has a section on "Residential New Construction." *See* Manual at 72-76. New construction is defined as "[c]onstruction that is characterized by the introduction of new elements, sites, buildings, or structures or additions to existing buildings and structures in historic areas and districts." Manual at 122. The section on new construction could be applicable to the treatment of the townhomes. While they are not "new" in the sense that they are not being built now, they are "new" in the sense that they are not historic. Many of its provisions discuss the fact that new structures should be similar to the surrounding historic properties. Pictures of modern houses are given which show compatibility with historic homes. Manual at 76. We defer to the Board to determine whether modifications to the townhomes are governed by this section in addition to or instead of the other sections.

However, in examining how the Manual applies, we do take note of how the staff addressed these issues.

In the section on siding and trim, the Manual mostly focuses on the retention of historic siding and does not clarify what should occur if an applicant wishes to replace non-historic siding:

**SI1** Retain *historic siding*.

**SI2** Leave *historic siding* visible.

**SI3** Repair *historic siding* using matching materials.

**SI4** If replacement is required, replace *historic siding* with siding that matches the original in material, size, and design. Non-historic materials, such as cement board, may be used on elevations not visible from the street when replacement of original siding is required. Textured or 'rusticated' siding is not an acceptable substitute material.

**SI5** It is preferable and acceptable to remove synthetic siding materials and to restore *historic siding*.

. . .

**SI11** Do not install vinyl or aluminum siding on primary elevations on *historic buildings*. Retention of exposed original wood siding is always preferred, however, if a decision is made to apply siding to side or rear elevations, it should be done in such a way that does not obscure or damage historic ornamentation, such as fishscale shingles, window casings, sills, hoods, brackets, and corner boards.

**SI12** Use only vinyl or aluminum siding that matches the dimensions of the original siding.[22]  Generally, smooth-faced, narrow profile siding (three or four inches depending on the character of the existing siding) is acceptable for installation on secondary elevations Wherever possible without causing damage to *historic fabric*, trim, such as corner boards, should project slightly beyond the vinyl siding.

Manual at 62-63 (emphasis added).  A diagram titled "Inappropriate Replacement Siding Types" shows depictions of "'Wood-Grained' Vinyl Siding" and "Wide Aluminum or Vinyl Siding[.]"  Manual at 62.  Another diagram titled "With Vinyl Siding Must Come Ventilation" indicates "[w]here vinyl siding is approved, airflow between historic siding and vinyl siding must be maintained, or moisture can cause unseen structural deterioration."  Manual at 63.

It is notable that many of these guidelines seem to have no applicability whatsoever to non-historic siding on non-historic buildings, except perhaps by analogy or in terms of clarifying what is expected of historic buildings in the district in which these non-contributing buildings exist and from which they should generally not detract.  From reviewing these guidelines, it should be evident that non-historic wood siding does not always have to be replaced with wood

___

[22] The Manual does not clarify what to do if there is original siding of two sizes and/or types of material, which appears to be the case when it comes to the building, where there is wider white siding that appears to be made of wood, and narrower tan siding that appears to be made of vinyl.

siding on non-historic buildings, as historic wood siding does not always have to be replaced with wood siding even on historic buildings.

In the staff review provided in the Compliance Form, while staff recognized that the townhomes are not historic, the review repeatedly applied standards referencing historic siding. For example, on SI1 "[r]etain historic siding[,]" staff noted "[t]he applicant must address the need to replace the siding." On standards SI3 and SI4, which address the replacement of historic siding, the staff indicated that "[t]he Applicant must address the material."

In our view, SI11 ("[r]etain historic siding") raises more questions than it answers when it comes to non-historic buildings. If vinyl or aluminum siding is not to be installed on primary elevations on historic buildings, is it acceptable to install these types of siding on non-historic buildings on primary elevations? Is vinyl or aluminum siding appropriate, if not preferred, on side or rear elevations on all buildings? Does the preference for retention of exposed original wood siding justify a blanket denial of any proposals to replace it with vinyl siding regardless of where on a building such a change is to be made? Does that answer change if the building at issue is a non-historic building? The staff review of this provision only noted that the applicant's siding is on the rear of the structure and the garage, with the trim visible.

SI12 ("[l]eave historic siding visible") does apply as it addresses matching original siding, and the townhomes did have original siding when they were built. However, it seems to contemplate the use of vinyl siding as a potential replacement for original siding so long as the same dimensions are maintained. It appears that its second sentence potentially provides an exception to the first sentence when it comes to secondary elevations, allowing for siding that is narrower than what was originally present. The staff review of this guideline only noted that the applicant needed to address the dimensions of siding and trim.

We believe that where consultation with the Manual does not have a clear answer as to what types of materials can be replaced on non-historic properties, the general consideration that work on non-historic buildings should "maintain or enhance their relationship and compatibility with adjacent historic buildings and streetscapes" allows for a suitable range of latitude to be given in the maintenance of such structures. We believe there is no reason why materials of different compositions that closely resemble the materials that were previous approved when non-historic buildings were constructed should not be allowed.

From reading SI11 and SI12 together, along with reviewing the diagrams, we believe that the Board needed to give Richard's application seeking to be allowed to replace the siding on the back of the building with vinyl siding careful consideration as vinyl siding could be permissible in that location. Even if,

given the building's corner location, the townhomes essentially have no back side, if replacing historic siding on historic homes is permissible on the sides of historic homes, it should be appropriate on the back of the townhomes, so long as such vinyl siding matches the original siding dimensions or is compatible with the general appearance of historic siding.

We see nothing in the Manual mandating the use of costlier materials (that may be more difficult to maintain) on non-historic buildings if the general appearance of the property at the end does not differ. The maxim "you can put lipstick on a pig, but it is still a pig" illustrates that no matter what materials are used on a non-historic building, it is not going to become a historic building. While a building built in 1988 may not be a "pig," it is not a "thoroughbred." At best, it can be made to not detract from the historical buildings in the District; however, we do not believe that the use of quality vinyl siding compared to wood siding will make any substantive difference, especially if it closely resembles historic wood siding and/or looks similar to other non-historic structures nearby. In fact, if the conditions for changing out materials are too onerous and expensive, buildings may fall into disrepair, which would detract from the character of the District.[23]

_____

[23] Donna argued during oral argument that the wood siding she replaced was deteriorating or rotting and the changes she made to the townhomes ultimately improved the property. We have no opinion as to what the existing condition of the siding was. In the photographs it is difficult

We do not attempt to sort out these issues, as we properly defer to the Board to interpret these regulations but refer to these guidelines in the Manual to show that the rejection of what Richard wished to do without specific consideration of his actual situation was inappropriate and arbitrary. Once the Board made the requisite factual findings, it then had to apply the Manual in order to decide if it would recommend Richard's proposed changes be approved by the City through a COA.

A much more thoughtful and nuanced evaluation of the relevant provisions was needed rather than what Richard received as to all the items he wished to replace. There are specific guidelines for various elements,[24] including as relevant to Richard's application: architectural details and features,[25] fences and

_____

to tell whether the siding was deteriorating or just rather dirty, and if it had deteriorated, whether repair or replacement was warranted.

[24] As we addressed the siding issue as an example, we do not delve into the possible interpretations to be given to the provisions relevant to each alteration Richard wished to make. We observe that a comparison of these provisions reveals that different elements are treated differently from one another and illustrates that the Board needed to examine each category of item that Richard wanted to replace individually.

[25] We believe this category is generally relevant to the trim work Richard wanted to replace, which would include soffits and the like. The staff's review of this category illustrates a disconnect in its attempt to shoe-horn in a non-historic property into standards developed to preserve historic buildings. For example, under AR1 and AR2, which pertain to the retention and repair of "historic architectural details" it was noted "[t]he townhomes are not historic"; however, under AR4 which discusses when "historical architectural details" can be replaced, it was noted that "[t]he Applicant must address the choice of vinyl materials."

-41-

walls, gutters and downspouts, and windows.[26]

_____

[26] For windows, the following provision, although concerned with historic windows and non-historic windows in historic buildings, could be helpful in clarifying what is appropriate for non-historic windows in non-historic buildings.  At minimum, if something is allowed for non-historic windows in historic buildings, the same should be allowed for non-historic windows in non-historic buildings:

> **W3** Historic windows on primary elevations ("front" or "front" and "side" for corner properties) must be preserved . . . .  If windows are non-historic they may be replaced with energy efficient windows that closely replicate what were on the building historically.  In most cases, character-defining historic windows on secondary elevations ("side") should be preserved – especially if they are viewable from a public way. . . .  Replacement may be appropriate if they are not character-defining. . . .  In most cases, windows on tertiary elevations ("rear") may be replaced with energy efficient replacements.

Manual at 69-70.  A "box" listing reasons why historic wood windows should be preserved, indicates "[v]inyl windows don't look like historic wood windows; their texture and thinness are inappropriate for the historic district."  Manual at 71.

The Compliance Form notes under W1 and W2, which pertains to retaining and repairing "historic windows" that "[t]he townhomes are not historic" but then proceeds to treat the townhome windows as historic in its application of a W3 standard that only applies to the replacement of "historic windows[.]"  However, even more problematic than that, the W3 standard the staff referenced was from the 2008 version of the Manual which was renumbered with significant alterations in the 2012 Manual as W4.

We compare the two:

> **W4** Replace severely deteriorated _historic and character-defining windows_ with new windows that convey the same visual appearance.  Select windows that match the historic materials, sash dimension, muntin configuration, reveal depth, glass-to-frame ratios, glazing patterns, frame dimensions, trim profiles, and decorative features when repair of original windows is impossible.

2012 Manual at 70 (emphasis added).

> **W3** Replace severely deteriorated _historic windows_ with new windows that convey the same visual appearance.  Replacement windows may either be accurate reproductions using historical, pictorial, and physical documentation or be a new design that is

The Board's interpretation that the Manual required "like be replaced with like" was arbitrary and capricious as it was at odds with the Manual's detailed provisions. To avoid such an error going forward, the Board should specifically reference which provisions govern its decision and recommendation to the City. This is needed to facilitate appropriate review.

We briefly address the fencing issue as another relevant example as this is the only matter regarding the composition of an existing element on which a factual finding was made, with the Board finding that the townhomes had an existing wooden privacy fence. The Board indicated that the fence needed to be replaced with a new wooden privacy fence as approved by staff.

As to fences, the Manual provides in relevant part:

**F5** Use historically appropriate fencing materials, such as wrought iron and wood.

. . .

**F9** Use privacy fences that are solid wood boards . . . .

. . .

compatible with the historic character of the building and the district. *Use of vinyl – and aluminum-clad wood window systems primary elevations may be permissible if the proportion and detail closely match the original.*

2008 Manual at 69 (emphasis added) (the exact language provided in the Compliance Form).

The application of outdated or omitted standards is erroneous and to the extent the Board relied on the staff's evaluations of the incorrect standards, this would provide another reason to void the COA.

> **F12** Do not install vinyl, chain-link, split-rail, latticework, or wovenwood fencing, or concrete block walls in areas that are visible from a public way.

Manual at 84.

Donna notes in her annotation to an exhibit providing the Manual's provision for FE1 that "218 Broadway – next door to subject property has White Vinyl fence on back patio" to justify why she should be allowed vinyl fencing also. It is unknown whether this neighbor properly complied with the COA application and approval process and, if so, whether this fencing is visible from the street.

While a factual finding was made as to the existing character of the fence, no finding was made as to whether the townhomes' privacy fence(s) was visible from a right of way.[27] Additionally, it was improper to leave approval of a final fence design to the staff.

## CONCLUSION

We recognize the importance of preserving the innate character of Bardstown's Historic District, but the Historical Review Board does not have the discretion to act in whatever manner it chooses to fulfill this goal. While a full consideration of applications to alter the exterior of buildings within the district

---

[27] The Compliance Form states in its review of FE12, which remains the same in the 2008 Manual and 2012 Manual, that "[t]he [townhomes'] fence is viewable from North 5th Street." However, the Board did not adopt this as a finding. If the neighbor's fence cannot be viewed from the street when the townhomes' fence can, this could account for the different treatment the two fences received.

may require more time and effort, this cannot justify the Board delegating its responsibility to make factual findings to its staff or oversimplifying the guidance that constrains its actions in making such decisions.

Accordingly, we reverse and remand the Nelson Circuit Court's judgment affirming COA-15-19 and granting the City's request for an injunction. As there has been no appropriate final action by the Board, there was no proper COA by the City. Therefore, we direct the circuit court to vacate COA-15-19 and remand this matter to City to remand to the Board to make factual findings and appropriate rulings based on the 2012 Manual.[28] Because the matter must begin anew, both Donna's petition for a declaration of rights and the City's request for an injunction were premature, as were the circuit court's rulings on the petition and injunction.

ALL CONCUR.

---

[28] While making findings as to what material was on the exterior of the townhomes prior to Richard seeking a COA will now be more difficult to resolve given the changes made to the townhomes, the existing photographs can be considered along with any other documentation and witness testimony. The parties may of course enter into an agreement to apply the current 2018 Manual if they prefer. If the replacement materials would have been acceptable, the granting of a COA will essentially permit the installation of replacement materials which has already taken place.

-45-

BRIEFS AND ORAL ARGUMENT
FOR APPELLANT:

Jason P. Floyd
Bardstown, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEE:

Audrey L. Haydon
Bardstown, Kentucky